# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-01800-SCT

*SHEILA EALEY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/28/2013 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/12/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KITCHENS AND COLEMAN, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     Sheila Ealey gave birth to a baby boy in a hotel room, wrapped the baby in a comforter, put him in a suitcase, and left the suitcase behind her church. A jury found her guilty of capital murder with the underlying felony of child abuse, and the circuit court sentenced her to life without parole. On appeal, Ealey asserts that the trial court erred in refusing an accident-or-misfortune jury instruction and that the evidence was insufficient to support the guilty verdict. She also urges the Court to abandon and replace the *M'Naghten*[1] Rule on insanity. Ealey's issues lack merit. We affirm.

---

[1] *M'Naghten's Case*, 8 Eng. Rep. 718 (1843).

**Factual Background**

¶2.     Sheila Ealey claims a man abducted and raped her in September 2009. Ealey did not tell anyone. Several months later, Ealey discovered that she was pregnant. She did not tell anyone that she was pregnant; her family and coworkers never realized it. At that time, Ealey was a forty-one-year-old single mother of five children. Ealey's oldest daughter was a nurse, her oldest son was in high school, and her three youngest children were in middle school. According to her children, Ealey provided for them and was a good mother. Ealey worked at a church daycare, and her coworkers said she was a good teacher. Ealey attended Smith Chapel Baptist Church with her family, and she was involved in many church activities.

¶3.     Ealey's great-uncle, Victor Washington, was the groundskeeper at Smith Chapel. On July 1, 2010, Washington was mowing grass at the church when he noticed a suitcase partially hidden in a wooded area behind the church. Although he thought it was strange, he did not then inspect the suitcase. The suitcase was still there when Washington returned the following day, and Washington called a church trustee to inspect it. The trustee was Calvin Ealey, who happened to be Ealey's father. Carolyn Robinson, Ealey's aunt, arrived at the church with her brother Calvin. As the trio approached the suitcase, they saw green flies swarming around it, and they suspected that something might be dead. They called the sheriff's department without ever touching the suitcase.

¶4.     Madison County Sheriff Deputy Jimmy Knight responded and retrieved the suitcase. Inside the suitcase, Deputy Knight found a comforter stuffed into a black trash bag. As he inspected the contents, he saw blood and a baby's hand. Deputy Knight called Sheriff's

2

Investigator Robin Welch, who came to the church with the police chief. Welch photographed the scene and called the coroner. Later that day, Welch was notified that Ealey was at the Sheriff's Department, and she wanted to speak to an investigator. Welch advised Ealey of her *Miranda* rights,[2] which she said she understood, and she signed a waiver-of-rights form. Ealey then gave a verbal statement.

¶5. Ealey told Welch that she had been raped in September 2009. In January 2010, she discovered she was pregnant, and she thought the pregnancy resulted from the rape. Ealey did not tell anyone about the rape or the pregnancy, and she did not seek prenatal care. On Saturday, June 26, 2010, Ealey woke up with labor pains. She left home around 1:00 p.m., taking a suitcase and a bed comforter. The suitcase was empty except for a trash bag that she used for laundry when she traveled. Ealey went to the Super-8 Motel in Gluckstadt and checked in. She spread the comforter on the floor and gave birth to a child on the motel room floor.

¶6. Ealey said that she fell asleep after giving birth. When she woke up, she wrapped the baby in the comforter, put the comforter in the suitcase, and put the suitcase in the trunk of her car. Ealey then drove to Smith Chapel and left the suitcase behind the church. Ealey went home, took a bath, and washed her clothes. She did not tell anyone what happened. Ealey attended church at Smith Chapel the following morning, but she said she could not sit through the entire service. Ealey's verbal statement was not recorded, but she provided a

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

written statement as well. In her written statement, Ealey wrote that she intended to go back to the church and take the child to a hospital.

¶7.    Welch conducted three interviews with Ealey and obtained two written statements. Her story was consistent each time with two exceptions: (1) whether Ealey had heard the baby cry, and (2) whether anyone other than the attacker could have been the baby's father. During the first interview on July 2, Ealey said she heard the baby cry only once in the motel room before she wrapped the child in the comforter and put him in the suitcase. In her written statement given the same day, she wrote, "I am not sure if the baby was crying, *I did hear it initially* but after that I'm not sure." During a second interview the following day, Ealey said the baby cried twice – once at birth and once when she was putting the suitcase in the trunk. Investigator Todd Wilson was present for the second interview, and he confirmed that Ealey said the baby cried twice. Ealey later told a psychologist that "she thought she heard a baby cry, but she wasn't sure."

¶8.    During the interviews on July 2 and 3, the implication was that the pregnancy resulted from the rape, and Ealey did not suggest that anyone other than the attacker could have been the father of the child. In her written statement from July 2, she wrote, "I had been carrying the incident around with me and to think I had to have a baby with someone who had raped me. I couldn't wrap my mind around it." Several days later, on July 7, Ealey contacted Welch and told him that Jerry Bolden, her longtime boyfriend and the father of four of her children, could have been the father. She provided a written statement confirming that "Bolden could possibly be the father of the child." DNA testing later confirmed that Bolden was the father.

4

¶9. A Madison County grand jury indicted Ealey for capital murder with the underlying felony of child abuse. Ealey entered a plea of not guilty, and she presented an insanity defense at trial.[3] Dr. Feng Li, who had performed the baby's autopsy, was accepted as an expert in forensic pathology. Dr. Li testified that he did not determine cause of death when he did the autopsy.[4] However, after reviewing details from the investigation, Dr. Li opined that the cause of death was "more likely than not asphyxia" and that the manner of death was homicide.

¶10. Ealey's son, Jerald Ealey, was called as a witness for the defense. Jerald testified that Ealey was the sole provider for her children and that she received little support from his father, Bolden. Jerald said his mother was very protective of her children and that they confided in her. Jerald testified that he went to church with Ealey the day after the incident. He said she looked fine, but she did not feel well and did not go to lunch with the family after church that day.

¶11. The defense also called Dr. Gerald O'Brien, and he was accepted as an expert in forensic psychology. Dr. O'Brien had evaluated Ealey and performed a full psychological assessment. He testified that Ealey's IQ was in the low-average range and that she did not exhibit signs of malingering. He testified that Ealey was suffering from major depression

---

[3] Ealey was indicted in October 2010, and trial was set initially for July 2011. After multiple continuances, agreed to by both parties, Ealey's trial took place in August 2013.

[4] Dr. Li testified: "At the time of the autopsy, . . . I didn't have all of the information available, and a lot of times we don't want to delay the signing out or finishing a case for too long, so I leave that cause and manner of death undetermined for the possibility of future. If we have more information, new information, then we can always change to other cause or manner of death."

and anxiety and that she had been for at least one year prior to the incident. Dr. O'Brien opined that there was "clear evidence of extreme mental or emotional disturbance at the time of the alleged offense" and, in his opinion, "strongly suggestive evidence" indicated that Ealey "was unable to know the nature and quality of her acts [and] the difference between right and wrong" at the time of the incident. However, he could not say "to a reasonable degree of scientific, psychological, or mental certainty" that Ealey did not know right from wrong at the time of the incident. And, to the contrary, he admitted that Ealey's statements that she would never hurt anyone, especially a child, and the fact that she turned herself in and wanted to make a confession reflected an understanding that she had done something wrong. Dr. O'Brien testified that, in his opinion, no one could say with any degree of certainty whether Ealey was sane at the time of the incident.

¶12. The State presented several lay witnesses and expert witnesses to rebut Ealey's claim that she was insane at the time she committed the offense. Three of Ealey's coworkers were called to testify. Ealey had worked at the daycare for a year and a half, and she worked with four-year-old children. The assistant director of the daycare testified that Ealey was a good teacher, that she got along well with the other teachers, and that the parents and children liked her. Likewise, another coworker testified that Ealey "did a great job" and that the parents and children loved her. They each testified that Ealey did not exhibit any odd or irrational behavior in the week leading up the incident, and they did not have any indication that Ealey was mentally ill or unstable. Each coworker testified that, in their opinion, Ealey knew the difference between right and wrong at that time.

6

¶13.    The State called Dr. Criss Lott as an expert in forensic psychology.  Dr. Lott had evaluated Ealey, performed personality and psychological testing, reviewed information about the case, and interviewed Ealey's family and coworkers.  The purpose of Dr. Lott's evaluation was to assess Ealey's mental state at the time of the offense and to determine whether she was capable of assisting in the preparation of her defense.  Dr. Lott interviewed Ealey's five children, her brother, and the daycare director.  He testified that Ealey's family members did not notice any odd behavior before the incident.  Dr. Lott said Ealey reported that she was experiencing depression, which was consistent with his clinical observations.  However, Dr. Lott saw Ealey only after the incident, when she was incarcerated, and he explained that "it would not be uncommon" for a person in Ealey's situation to suffer from situational depression and anxiety.  Dr. Lott administered an intellectual capacity and functioning test, and Ealey scored in the average to low-average range.  Dr. Lott did not think Ealey was malingering regarding her intelligence or exaggerating her depression.

¶14.    Dr. Lott opined that Ealey was suffering from major depression when he saw her, but that her depression could have been ongoing for some time prior to the incident. However, he did not believe that, prior to the incident, her depression was so severe that she could not function.  Dr. Lott also opined that depression was entirely different from insanity and that Ealey was not insane.  Dr. Lott's opinion, which he testified was to a "reasonable degree of psychological certainty," was that Ealey would have been able to understand what she was doing and that she would have been able to understand the difference in right and wrong at the time she gave birth.  He testified that, in his opinion, Ealey knew that what she did was wrong.  Dr. Lott explained that Ealey had exhibited remorse after the incident and said that

7

she felt significant guilt, which was evidence that she understood she had done something wrong. However, in his report, he concluded that, although Ealey did not meet the *M'Naghten* criteria for insanity,[5] he thought "her depression adversely affected her ability to respond rationally to her situation and to conform her conduct to the requirements of the law."

¶15. Dr. Reb McMichael, who was accepted as an expert in forensic psychiatry, also evaluated Ealey and testified for the State. Dr. McMichael opined that Ealey had experienced depression and anxiety off and on for many years. However, in his opinion, at the time of the offense, Ealey knew the nature and quality of her actions and knew right from wrong. In talking to Dr. McMichael, Ealey did not mention hearing the baby cry at birth; she said when she woke up "there was silence." Ealey told Dr. McMichael that she did not mean to harm the baby, but she was being selfish and thinking about herself and she just wanted it to be over. Dr. McMichael testified that, in his opinion, Ealey was not suffering from a major mental disorder when the incident occurred. Like Dr. Lott, Dr. McMichael opined that situational depression and anxiety for a person in jail was not unusual and, in fact, it would have been unusual if Ealey was not depressed or anxious.

¶16. At the conclusion of the trial, the jury found Ealey guilty of capital murder with the underlying felony of child abuse. The court sentenced Ealey to life imprisonment without

---

[5] *M'Naghten's Case*, 8 Eng. Rep. 718 (1843). The *M'Naghten* test for determining insanity is whether the accused knew right from wrong at the time the act was committed. *See Woodham v. State*, 779 So. 2d 158, 163 (¶ 27) (Miss. 2001); *Russell v. State*, 729 So. 2d 781, 784 (Miss. 1997).

parole.  Ealey filed a Motion for Acquittal Notwithstanding the Verdict or for New Trial, which was denied.  Ealey appealed.

## Analysis

¶17.    Ealey was convicted of capital murder with the underlying felony of child abuse under Mississippi Code Sections 97-5-39(a)(2) and 97-3-19(2)(f).  She raises three issues on appeal: (1) whether the trial court erred in refusing her accident-or-misfortune jury instruction; (2) whether the evidence of capital murder was sufficient and whether the verdict was contrary to the weight of the evidence; and (3) whether the *M'Naghten* Rule on insanity should be abandoned and replaced.

### I.    Whether the trial court erred in refusing Ealey's accident-or-misfortune jury instruction.

¶18.    The standard of review for a trial court's grant or denial of a jury instruction is abuse of discretion.  *Newell v. State*, 49 So. 3d 66, 73 (¶ 20) (Miss. 2010).  Ealey submitted an accident-or-misfortune jury instruction under Mississippi Code Section 97-3-17(a).  That section provides: "The killing of any human being by the act, procurement, or omission of another shall be excusable: (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent[.]"  Miss. Code Ann. § 97-3-17 (Rev. 2014).  If the jury finds that a killing occurred by accident or misfortune while doing "a lawful act by lawful means with usual and ordinary caution and without any unlawful intent," then it is considered "excusable homicide" and is not punishable.  *Burge v. State*, 472 So. 2d 392, 395 (Miss. 1985) (citing Miss. Code Ann. § 97-3-17(a) (1972)).

9

¶19. Ealey's proposed accident-or-misfortune jury instruction read:

> The Court instructs the jury that if you find that the baby Ealey died as the result of accident or misfortune while Sheila Ealey was engaged in a lawful act by lawful means, with usual and ordinary caution, and without unlawful intent, then you shall find the Defendant, Sheila Ealey, not guilty of Capital Murder as charged in the indictment, and return your verdict as follows: "We, the Jury, find the Defendant, Sheila Ealey, not guilty of Capital Murder, as charged in the indictment, by reason of accident or misfortune."

The trial judge denied the instruction, holding that there was no evidentiary basis to support an accident-or-misfortune instruction. Ealey claims that the evidence did support the instruction, because the evidence presented was inconclusive regarding when the baby died and the manner of death. Part of Ealey's defense at trial was that, if the baby's death was caused by accident or misfortune, then the homicide was excusable. Thus, Ealey claims that, by refusing the accident-or-misfortune jury instruction, the trial court did not allow her to present her theory of the case to the jury. While a defendant is entitled to have jury instructions given that present his theory of the case, that entitlement is not without limits – "the court may refuse an instruction [that] incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Newell*, 49 So. 3d at 74 (¶ 20) (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶ 45) (Miss. 2008)).

¶20. We have held that "[j]ury instructions should be given only when facts developed in the case being tried support them." *Simmons v. State*, 805 So. 2d 452, 473 (¶ 30) (Miss. 2001). The trial court will not be put in error for denying a jury instruction when the evidence was insufficient to support the instruction. *Id. See also Batiste v. State*, 121 So. 3d 808, 845-46 (¶ 75) (Miss. 2013); *Robinson v. State*, 758 So. 2d 480, 489 (¶ 37) (Miss. Ct. App. 2000). In *Robinson v. State*, the defendant requested an accident-or-misfortune

instruction for the theory that his gun accidentally went off when he was trying to break up a fight. **Robinson**, 758 So. 2d at 489 (¶ 34). No one testified that Robinson drew the gun in an effort to stop the fight; Robinson himself even "repeatedly denied that the weapon was fired, either accidentally or otherwise." **Id.** at 489 (¶ 37). The Court of Appeals held that the trial judge did not err in denying the instruction because it was not supported by the evidence. **Id.**

¶21. Ealey argues that, even if the child was alive when she put him in the suitcase, his death could have been an accident. She asserts that she could have been disoriented when she woke up due to blood loss, resulting in her exercise of poor judgment. While she was in custody, Ealey was hospitalized and treated for postpartum hemorrhaging and severe anemia. The State's experts both testified that blood loss after giving birth could have affected Ealey adversely and caused her to be delirious. Ealey was treated for postpartum hemorrhaging after she was in custody, which was at least one week after the baby was born. Immediately after the child was born, however, Ealey was able to walk to her car, drive to the church, carry the suitcase to the woods, drive home, bathe, wash her clothes, and attend church the following morning. She then went to work the following week. No one noticed any odd behavior during that time. There is no evidence to support that Ealey was delusional or delirious.

¶22. Ealey also claims that the child could have died when she was asleep, before she put him in the suitcase, thus, the child's death could have been an accident and the result of Ealey's choice to have an unattended birth. To support that theory, Ealey points to her own confusion about whether she heard the child cry once or twice and to her own statement that

11

she did not detect movement when she wrapped the baby in the comforter. The trial judge said, "her saying she doesn't recall is not a sufficient factual basis for the jury to return a verdict of accident or mistake" and "her later statement that she didn't recall is not tantamount to her saying the baby didn't cry." Ealey's own statements contradicted her theory that the child died while she was asleep because, at one point, Ealey said the child cried when she put the suitcase in the trunk.

¶23. Finally, Ealey argues that her failure to seek medical care could have been considered abusive behavior and, therefore, she was entitled to the accident-or-misfortune instruction because "omissions" that are considered abusive are not necessarily purposeful. There is no evidence to support the contention that Ealey's decision not to seek prenatal care and not to seek medical care during the birth was anything other than intentional and purposeful. She readily admitted that she told no one about the pregnancy and did not seek medical care. In *Buffington v. State*, the Court held that "failure to feed, nourish, or provide medical care to a child can be *intentional*, and such a refusal may cause serious bodily harm" and acts of omission are included as abusive behavior. *Buffington v. State*, 824 So. 2d 576, 582 (¶ 24) (Miss. 2002) (emphasis added).

¶24. The State argues that the trial court correctly denied Ealey's accident-or-misfortune instruction because the evidence does not support that Ealey acted with "with usual and ordinary caution" as required for a homicide to be excusable under Section 97-3-17(a). Specifically, the State writes that Ealey did not act "with usual and ordinary caution" by giving birth in a hotel room rather than in a hospital, by wrapping the child in a comforter and putting the comforter in a garbage bag, by transporting the child in a suitcase in the trunk

12

of her car, and by abandoning the child at a church. We agree. The evidence did not support the accident-or-misfortune instruction, because the evidence presented did not show that Ealey acted with "with usual and ordinary caution," and Ealey's own statements contradicted her theory that the child died before she put him in the suitcase. The trial judge's denial of the accident-or-misfortune instruction did not amount to an abuse of discretion.

## II. Whether the evidence of capital murder was sufficient and whether the verdict was contrary to the weight of the evidence.

¶25. Ealey claims that the evidence did not support the verdict and the verdict was contrary to the weight of the evidence. She asks the Court to do one of the following: render an acquittal; reverse and remand for a new trial; reverse and render a manslaughter conviction; or reverse and remand for resentencing for the crime of manslaughter.

### A. Sufficiency of the Evidence

¶26. Claiming that the evidence was insufficient to support a capital murder conviction, Ealey asks the Court to reverse and acquit. When the challenge is to the legal sufficiency of the evidence, "the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.'" *Beasley v. State*, 136 So. 3d 393, 401-402 (¶ 29) (Miss. 2014) (quoting *Ivy v. State*, 949 So. 2d 748, 751 (Miss. 2007)). On appeal, we view all of the evidence "in the light most favorable to the verdict." *Beasley*, 136 So. 3d at 402 (¶ 29) (citing *Bush v. State*, 895 So. 2d 836, 843 (Miss. 2005)). The evidence is legally sufficient to support the jury's verdict if "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense."

13

*Beasley*, 136 So. 3d at 402 (¶ 29) (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)).

¶27.    Ealey was indicted for capital murder with the underlying felony of child abuse under Sections 97-5-39(2)(a) and 97-3-19(2)(f).  Section 97-3-19 provides that a person is guilty of capital murder if she kills a human being "without the authority of law by any means or in any manner" while "engaged in the commission of the crime of felonious child abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony."  Miss. Code Ann. § 97-3-19(2)(f) (Rev. 2014).  At the time of the child's death, Section 97-5-39(2) provided, in pertinent part:

> (2)(a) Any person who shall intentionally (i) burn any child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm shall be guilty of felonious abuse of a child and, upon conviction, shall be sentenced to imprisonment . . . for life or such lesser term of imprisonment as the court may determine, but not less than ten (10) years. . . .

Miss. Code Ann. § 97-5-39(2)(a) (2006).  The Court has defined "serious bodily harm" under the child abuse statute to mean "bodily injury that creates a substantial risk of death, or permanent or temporary disfigurement, or impairment of any bodily organ or function." *Buffington*, 824 So. 2d at 579 (¶ 13) (citing *Wolfe v. State*, 743 So. 2d 380, 385 (Miss. 1999)).    Further, "acts of omission are adequate to constitute felony child abuse." *Buffington*, 824 So. 2d at 577, 582 (¶¶ 2, 25).

¶28.    Ealey admits that she "discarded" her baby, but she asserts that the evidence established only that the baby had died from neglect, deprivation, or abandonment, which

14

would be a misdemeanor under Section 97-5-39(1),[6] not from felonious child abuse under

Section 97-5-39(2). The only support Ealey provides for her claim that the evidence was

insufficient to support the verdict is as follows: "No rational trier of fact could conclude that

Ms. Ealey, the good mother and daycare worker, would intentionally abuse a child; rather,

the evidence was clear that her abandonment of the child resulted from poor judgment which

was symptomatic of clinical depression and physical debilitation or legal insanity." Ealey's

conclusory statement is insufficient to rebut the actual evidence presented at trial. The

evidence was sufficient to find that Ealey intentionally tortured or abused her child "in such

a manner as to cause serious bodily harm." *See* Miss. Code Ann. § 97-5-39(2)(a) (2006).

The result of Ealey's conduct was the child's death, therefore, because the death resulted

---

[6] Ealey claims that the evidence established only neglect, deprivation, or abandonment, under Section 97-5-39(1)(a) or (b). At the time of the child's death, that section provided, in pertinent part:

> (1)(a) Except as otherwise provided in this section, any parent . . . who intentionally, knowingly or recklessly commits any act or omits the performance of any duty, which act or omission contributes to or tends to contribute to the neglect or delinquency of any child or which act or omission results in the abuse of any child, as defined in Section 43-21-105(m) of the Youth Court Law, . . . shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed One Thousand Dollars ($1,000.00), or by imprisonment not to exceed one (1) year in jail, or by both such fine and imprisonment.

> (b) If the child's deprivation of necessary food, clothing, shelter, health care or supervision appropriate to the child's age results in substantial harm to the child's physical, mental or emotional health, the person may be sentenced to imprisonment for not more than five (5) years or to payment of a fine of not more than Five Thousand Dollars ($5,000.00), or both.

Miss. Code Ann. § 97-5-39(1)(a), (b) (2006).

15

from Ealey's "commission of the crime of felony child abuse," the evidence supported a conviction for capital murder. *See* Miss. Code Ann. § 97-3-19(2)(f) (2006).

¶29.    After her baby was found dead, Ealey turned herself in to the police. She voluntarily confessed, telling officers that she gave birth alone in a hotel room, wrapped the newborn baby in a comforter, put the comforter in a suitcase, and left the suitcase in the woods behind her church. The investigating officer testified that the suitcase found behind the church contained a garbage bag, which had a comforter stuffed inside it, and that the baby was wrapped in the comforter. The above-described facts were undisputed. Dr. Feng Li performed the autopsy on the baby. Although initially, due to the stage of decomposition, he was not able to determine whether the child had been born alive, after learning the facts of the case he concluded that the cause of death was more likely than not asphyxia and the manner of death was homicide. Part of his conclusion was based on Ealey's own testimony that she heard the child cry at least once. The jury heard Dr. Li's testimony and testimony from the investigating officers who responded to the crime scene and later took Ealey's statements.

¶30.    The jury was instructed that, to find Ealey guilty of capital murder, they must find beyond a reasonable doubt that Ealey killed her newborn son while "engaged in the commission of the crime of felonious abuse of said infant child by wrapping him in a bedspread, placing the said bedspread containing the infant son inside a garbage bag, placing the infant son inside a closed suitcase, and abandoning said infant so enclosed." Reasonable jurors could have concluded beyond a reasonable doubt that Ealey committed capital murder

16

as set forth in the jury instruction. The evidence presented at trial was sufficient to support the jury's verdict.

## B. Weight of the Evidence

¶31. Ealey also claims that the verdict was contrary to the weight of the evidence, and she asks the Court to reverse and remand for a new trial, to reverse and render a manslaughter conviction, or to reverse and remand for resentencing for manslaughter. She claims that the weight of the evidence did not support a finding that she was sane or that she committed capital murder. Challenges to the weight of the evidence are granted only if the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Beasley*, 136 So. 3d at 403 (¶ 35) (quoting *Bush*, 895 So. 2d at 844 (¶ 18)). Again, we view the evidence "in the light most favorable to the verdict." *Id.* "Factual disputes are properly resolved by a jury and do not mandate a new trial." *Beasley*, 136 So. 3d at 403 (¶ 35) (citing *Temple v. State*, 498 So. 2d 379, 382 (Miss. 1986)).

### *1. Sanity*

¶32. Ealey claims that the weight of the evidence did not support a finding that she was sane. The *M'Naghten* test for determining insanity is whether the accused knew right from wrong at the time the act was committed. *Woodham v. State*, 779 So. 2d 158, 163 (¶ 27) (Miss. 2001) (citing *Russell v. State*, 729 So. 2d 781, 784 (Miss. 1997)). Specifically, the Court has held that prove insanity under *M'Naghten*, it must be proven that, at the time of the act, the accused "was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that

17

he did not know that what he was doing was wrong." ***Woodham***, 779 So. 2d at 163 (¶ 27) (quoting ***Roundtree v. State***, 568 So. 2d 1173, 1181 (Miss. 1990)).

¶33. The determination of a defendant's sanity under the ***M'Naghten*** Rule is within the province of the jury, and the jury has discretion to accept or reject expert and lay testimony on the subject. ***Woodham***, 779 So. 2d at 164 (¶ 29); ***Russell***, 729 So. 2d at 784. A jury's finding on a defendant's sanity "will not be reversed if it is supported by substantial evidence." ***Woodham***, 779 So. 2d at 164 (¶ 29) (citing ***Davis v. State***, 551 So. 2d 165, 173 (Miss. 1989)). We have held that, "[i]n insanity defense cases, perhaps more than any other, a jury's verdict ought to be given great respect and deference." ***Sanders v. State***, 63 So. 3d 497, 503 (¶ 18) (Miss. 2011) (citing ***Laney v. State***, 486 So. 2d 1242, 1246 (Miss. 1986)).

¶34. Three experts in forensic psychology or psychiatry – Dr. O'Brien, Dr. Lott, and Dr. McMichael – testified at trial. They all agreed that Ealey suffered from depression and anxiety, but no one opined that she was legally insane. Dr. O'Brien testified that substantial evidence suggested that Ealey may not have been criminally responsible based on ***M'Naghten***, but he could not make a determination to a reasonable degree of scientific certainty. Dr. Lott testified that Ealey's depression may have affected her conduct and may have resulted in her exercising poor judgment; however, he opined that Ealey would have been able to understand what she was doing at the time of the offense and that she would have been able to understand the difference between right and wrong. Dr. McMichael testified that Ealey was suffering from emotional distress at the time of the offense but, in his opinion, the evidence did not indicate that Ealey was unable to understand the nature and quality of actions or the difference between right and wrong.

18

¶35. Although none of the doctors testified that Ealey satisfied the **M'Naghten** test for insanity, Ealey claims that, because the doctors testified that she was suffering from depression that could have adversely affected her ability to respond rationally, the weight of the credible evidence was that she was insane. In her brief, Ealey dismisses Dr. McMichael's opinion as "unsound" and concludes that the other two doctors actually considered her to be insane, even though they did not say so. Ealey's conclusion regarding the doctors' testimony is simply unfounded. The doctors were questioned specifically about the **M'Naghten** standard – whether she understood the nature and quality of her actions at the time of the crime and whether she knew right from wrong – and none of the doctors could say that Ealey was insane under that standard. Further, Ealey's coworkers and family members testified that, in the days immediately preceding the incident, Ealey went on with life as usual, she did not exhibit any odd behavior, and, in their opinions, she knew right from wrong.

¶36. The jury had ample evidence from which it could determine that Ealey was sane at the time of the offense. The overwhelming evidence was that Ealey suffered from depression, but none of the experts testified that she was insane under **M'Naghten**. Further, none of her family or coworkers testified that she acted differently at any time before or after the offense. Again, weighing testimony and determining sanity under **M'Naghten** is within the province of the jury, and the jury's finding will not be disturbed if it is supported by substantial evidence. **Woodham**, 779 So. 2d at 164 (¶ 29); **Russell**, 729 So. 2d at 784. The jury's finding that Ealey was sane was supported by substantial evidence, and the jury's finding was not so contrary to the evidence that allowing it to stand would sanction an unconscionable result.

## *2. Manslaughter*

¶37.    Ealey writes that "the weight of credible evidence was that [she] was legally insane during the conduct constituting the alleged homicide in this case" therefore, "the jury's verdict to the contrary resulted in a miscarriage of justice."  She claims that, at most, the evidence supported a manslaughter conviction.  She asks the Court to reverse and render a manslaughter conviction or to reverse and remand for resentencing for manslaughter.  Ealey did not raise the manslaughter theory before the trial court or request a manslaughter instruction.  Thus, her claim is procedurally barred.  *See Byrom v. State*, 863 So. 2d 836, 865-66 (¶ 96) (Miss. 2003) (citing *Evans v. State*, 725 So. 2d 613, 632 (Miss. 1997) (Issues not presented to the trial judge are "procedurally barred and error, if any[,] is waived. This rule is not diminished in a capital case.")).

¶38.    Further, the claim is without merit because a person who causes death during the commission of felonious child abuse can be convicted of only capital murder, not manslaughter.  *See* Miss. Code Ann. §§ 97-3-27, 99-3-19(2)(f) (Rev. 2014). Section 97-3-27 provides:

> The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except those felonies enumerated in Section 97-3-19(2)(e) and (f), or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.

Miss. Code Ann. § 97-3-27 (Rev. 2014).  Felonious child abuse is identified in Section 97-3-19(2)(f), thus, it is one of the felonies that cannot be relegated to manslaughter.  Therefore, where the evidence supports a conviction for child abuse, the resulting death cannot be manslaughter.  The crime is capital murder even if the defendant acted "without any design

20

to effect death." Miss. Code Ann. § 97-3-19(2)(f) (Rev. 2014). As discussed above, the evidence supports the jury's verdict that Ealey caused the death of her newborn child while engaged in the commission of felonious child abuse, by wrapping him in a comforter, putting him in a suitcase, and abandoning the suitcase behind her church. Thus, she cannot be convicted of manslaughter, and the issue is without merit.

### III. Whether the *M'Naghten* Rule on insanity should be abandoned and replaced with the Model Penal Code definition of insanity.

¶39. Ealey asserts first that the application of the *M'Naghten* test for determining sanity resulted in a violation of due process in her case. However, she failed to articulate how the application of *M'Naghten* denied her due process rights, therefore, that claim is without merit. *See Byrom*, 863 So. 2d at 880 (¶ 161) ("failure to cite relevant authority obviates [our] obligation to review such issues") (quoting *Simmons v. State*, 805 So. 2d 452, 487 (¶ 90) (Miss. 2001)).

¶40. Ealey then urges the Court to abandon the *M'Naghten* rule for determining sanity and to adopt Section 4.01 of the Model Penal Code of the American Law Institute. The Court repeatedly has rejected similar arguments and declined to abandon *M'Naghten*. *See, e.g., Burk v. State*, 506 So. 2d 993, 993 (Miss. 1987) (appellant urged Court to abandon *M'Naghten* Rule and to adopt Model Penal Code Section 4.01 as the legal definition of insanity; Court held that the proposition had been considered previously and that *M'Naghten* remained the law); *Laney v. State*, 421 So. 2d 1216, 1219 (Miss. 1982) ("[W]e are not swayed to abandon the use of the *M'Naghten* test of insanity, and we hold that *M'Naghten* remains the law in this state with regard to the insanity defense."); *Hill v. State*, 339 So. 2d

21

1382, 1385-86 (Miss. 1976) (holding that *M'Naghten* "better protects society's needs" than the Model Penal Code). Pursuant to the rule of *stare decisis*, we deny Ealey's request to abandon *M'Naghten*.

## Conclusion

¶41. The issues raised by Ealey are without merit. We affirm Ealey's conviction and sentence.

¶42. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT POSSIBILITY OF PAROLE, AFFIRMED. COURT COSTS, FEES, AND ASSESSMENTS IN THE AMOUNT OF $1,098.50 SHALL BE WAIVED BY THE COURT. ALL TIME SERVED IN PRETRIAL DETAINMENT IN THIS CAUSE IS CREDITED AGAINST THIS SENTENCE.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR. WALLER, C.J., NOT PARTICIPATING.**