# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00007-SCT

*SAMUEL HUNTER ANDERSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/08/2021 |
| TRIAL JUDGE: | HON. TONI DEMETRESSE TERRETT |
| TRIAL COURT ATTORNEYS: | LIEM ANOVA WALKER |
| | BRANAN PATRICK SOUTHERLAND |
| | GLENNARD MICHAEL WARREN, II |
| | RICHARD EARL SMITH, JR. |
| | JOHN W. BULLARD |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/13/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. A jury found Samuel Hunter Anderson guilty of the murder of his grandmother, Evelyn Davenport. On appeal, Anderson asserts that the trial court erred by refusing an accident-or-misfortune jury instruction and by admitting evidence of Anderson's other bad acts.

**FACTS AND PROCEDURAL HISTORY**

¶2.     In September 2020, Anderson and his girlfriend, Rhae Ann Height, were living on his grandmother Evelyn Davenport's property in the pool house behind Davenport's house. Height was scheduled to be in court in Simpson County on the morning of September 25 regarding a pending possession of methamphetamine indictment. The night before, she and Anderson stayed at a friend's house where they used methamphetamine. Height testified they had not slept in three days.

¶3.     Before heading to Simpson County, they drove to Davenport's house. Height testified that Anderson got out of the car and went inside. She heard Anderson and Davenport talking loudly. Then, Height saw Anderson come back outside, grab an unloaded shotgun from the backseat,[1] and load it before walking back inside with a look "like he was going to kill somebody." Height said she was scared and yelled at Anderson. After Anderson walked inside, Height moved to the driver's seat and quickly left the property. She picked up her friend Scott Noland, who gave her gas money so she could make it to court. But Height and Noland were stopped by police before Height made it to Simpson County. Height gave a statement and was later released.

¶4.     Anderson's sister Halley Wells also lived on her grandmother's property with her four children. When she returned to the property that morning after taking her children to school, she pulled into the driveway and saw a white Mustang that she had never seen before.

---

[1] Height said that she had placed the shotgun in the back seat of the car the night before. She took the weapon from a friend's husband because he was hitting her. Height said the person from whom she received the weapon unloaded it before giving it to her.

2

Height was inside the car, and Anderson was outside. Wells testified that it appeared they were arguing. Wells testified that this sort of bickering was unusual for Height and Anderson. At that moment, Wells saw Anderson leave the car with a gun, and she saw Height move to the driver's seat and leave. Wells watched her brother go into their grandmother's house with the gun, and then she heard a gunshot. Wells immediately tried to call her grandmother, who did not answer, and then she called 911. As Wells was talking to the 911 dispatcher, she saw Anderson run out of the house twice. The second time, he came out with the gun which he ran to hide in a shuttered crawl space under the house. Wells told the 911 dispatcher and responding police officers what she had seen.

¶5. Investigator Zach Primeaux responded to the scene. He and another officer entered the home and spoke to Davenport. She told the officers that her grandson—Anderson—had shot her with a shotgun, and Investigator Primeaux saw what looked like a gunshot wound to Davenport's abdomen. Davenport was transported by ambulance to UMMC.

¶6. Dr. Chinenye Iwuchukwu, a trauma surgeon, treated Davenport at the hospital. Dr. Iwuchukwu testified that Davenport was unstable and had an extensive amount—between fifty and one hundred—shotgun pellets in her abdomen. Dr. Iwuchukwu performed several surgeries to remedy the trauma to Davenport's abdomen and bowels, but Davenport did not recover, and she died thirteen days after being shot.

¶7. Because of her injuries, Investigator Primeaux could not speak to Davenport except for their on-scene conversation. Based on the information Anderson's sister Wells had provided to the dispatcher, Deputy Dustin Keys searched the crawl space under the house and

retrieved a shotgun. As officers were preparing to approach the pool house on the property where Anderson lived, Anderson approached the officers from the street. Anderson was arrested and transported to the Warren County Jail.

¶8. At trial, Anderson testified in his own defense. He testified that the night before the shooting, Height had asked him to go with her to her court appearance. Anderson testified that he had lent his truck to a friend and was driving that friend's Mustang. After a night of partying, where he and Height both got high on methamphetamine, Anderson testified that they returned to his grandmother's house so they could shower to get ready to go to court.

¶9. Anderson testified that when he told his grandmother he planned to take Height to the courthouse, she told him she did not want him to go. When he asked her for gas money, she refused. Anderson testified that his grandmother could likely tell that he was high, which might have been the reason she did not want him going with Height.

¶10. Then, Anderson went to the Mustang to retrieve the shotgun. Anderson testified that he knew the gun had been inside the Mustang since the night before, though he could not remember why it was there or why Height had it. He testified that because he had a prior felony conviction he did not want to travel with the gun, particularly to court, so he retrieved the gun (without looking at it or checking to see if it was loaded) to take it inside. He testified that his plan was to take the shotgun inside without his grandmother seeing it and place it in a closet. But, when he got inside, his grandmother could tell Anderson was hiding something, and she walked up and "snatched the gun" from him causing it to go off. Anderson testified that his grandmother fell to the ground, and, at that point, he panicked and

might have dropped the shotgun. Anderson testified that after his grandmother had been shot, she fell to the ground, but she managed to get up and go to her bedroom. Anderson testified that he was shocked because he "was mainly high on an illegal substance, methamphetamine." When asked why Height testified that he had an angry look before going inside with the gun, Anderson testified he did not know why she said that. He also denied taking a shell from the car's console and loading the gun. But he testified that he did not believe Height would lie about him. He admitted that he put the gun under the house but claimed he did so because he knew he "wasn't supposed to be around a gun" and was nervous and scared. Anderson testified that by the time he came outside, Height and the Mustang were gone.

¶11. Anderson testified that he left in a panic and headed toward his dad's house, which was within walking distance. He testified that he fell in a ditch and caught his breath. He knew no one would be home at his dad's house, so he kept running to where his friend Chase Cook lived. Anderson testified that he banged on Cook's door, but no one answered. Anderson testified that he called Cook in a panic but never got in touch with him. By then, Anderson heard sirens and went back home where he was arrested.

¶12. Anderson testified that he could not recall being mad at his grandmother, though he admitted they might have had an argument that morning. He said that he did not take the gun inside intending to shoot her and that he had only intended to leave the gun inside. He said his grandmother did nothing to provoke or enrage him.

5

¶13. Dr. Mark LeVaughn reviewed Davenport's medical records and performed Davenport's autopsy. Dr. LeVaughn testified that the gunshot that impacted Davenport was at close range, if not within skin-contact (both scenarios would produce the same wound). Dr. LeVaughn concluded that Davenport's cause of death was a gunshot wound to the abdomen and that the manner of death was homicide.

¶14. The State rested its case-in-chief at the close of Dr. LeVaughn's testimony, and the trial court denied Anderson's motion for a directed verdict. After considering the evidence and instructions that were given, the jury found Anderson guilty of murder. Anderson timely appealed.

## DISCUSSION

### I. Whether the trial court erred by refusing an instruction on excusable homicide.

¶15. Anderson submitted an accident-or-misfortune jury instruction under Mississippi Code Section 97-3-17(a) and (b), which provides:

> The killing of any human being by the act, procurement, or omission of another shall be excusable:
>
> (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
>
> (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;

Miss. Code Ann. § 97-3-17 (a), (b) (Rev. 2020).

¶16. Anderson's proposed instruction read:

The Court instructs the Jury that the killing of Evelyn Davenport by the act, procurement, or omission of Samuel Hunter Anderson shall be excusable:

When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, without any unlawful intent,

OR

When committed by accident or misfortune, in the heat of passion upon sudden and sufficient provocation.

If you find in this case that Evelyn Davenport was killed as a result of accident or misfortune, then you shall find Samuel Hunter Anderson, not guilty.

¶17. The State objected, and the trial court found the instruction unsupported by the evidence. This Court reviews jury instructions under an abuse-of-discretion standard. *Nelson v. State*, 284 So. 3d 711, 716 (Miss. 2019) (citing *Bailey v State*, 78 So. 3d 308, 315 (Miss. 2012)). This Court must read the instructions as a whole to determine whether the jury was properly instructed. *Id.* If the instructions as a whole "fairly state the law of the case and create no injustice," this Court will not reverse. *Id.* (quoting *Bailey*, 78 So. 3d at 315). While "[a] defendant is entitled to have jury instructions given which present his theory of the case[,]" this Court has held that a trial court "may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id.* (first alteration in original) (internal quotation marks omitted) (quoting *Bailey*, 78 So. 3d at 315). Anderson claims that because he testified the shooting was an accident, it was reversible error for the trial judge to refuse an accident-or-misfortune jury instruction.

¶18. Mississippi Code Section 97-3-17(a) would have required the jury to decide whether Anderson was acting lawfully and with ordinary caution. Anderson's position is that the trial

7

court erred by refusing his proposed instruction because, even if he was a convicted felon, his act of removing the shotgun from the Mustang did not automatically render him guilty of the crime of felon in possession.

¶19. Anderson contends that whether the act violated the law was a fact question for the jury to resolve in its consideration of whether the shooting fell under Section 97-3-17. The jury could have seen his act of discarding the firearm as a lawful and necessary act. If the jury finds that a killing occurred by accident or misfortune while doing "a lawful act by lawful mean with usual and ordinary caution and without any unlawful intent," then it is considered "excusable homicide" and is not punishable. *Burge v. State*, 472 So. 2d 392, 395 (Miss. 1985) (citing Miss. Code Ann. § 97-3-17(a) (Supp. 1984)).

¶20. Anderson admitted, however, that he was a convicted felon and that he was removing the weapon from the car because he did not want to violate the prohibition of his possessing a firearm. The State argues that since Anderson was a convicted felon, his removing the shotgun from the car with the intent to put it in the closet of his grandmother's house constituted the crime of felon in possession of a firearm.

¶21. Section 97-37-5(1) provides:

> It shall be unlawful for any person who has been convicted of a felony under the laws of this state, any other state, or of the United States to possess any firearm or any bowie knife, dirk knife, butcher knife, switchblade knife, metallic knuckles, blackjack, or any muffler or silencer for any firearm . . . .

*McGlasten v. State*, 328 So. 3d 101, 106 (Miss. 2021) (emphasis omitted) (quoting Miss. Code Ann. § 97-37-5(1) (Rev. 2020)). Anderson contends that he hid the shotgun out of necessity because he knew he was a convicted felon that should not have been in possession

8

of a firearm. In ***Towner v. State***, 726 So. 2d 251, 256 (Miss. Ct. App. 1998), the Court of Appeals held that when the defendant admitted he had been engaged in an unlawful act (carrying a concealed weapon), he was not entitled to an excusable homicide instruction.

¶22. Furthermore, the Court in ***Stodghill v. State*** explained what is needed to excuse criminal conduct based on necessity. ***Stodghill v. State***, 892 So. 2d 236, 238 (Miss. 2005). To prove that he had an objective need to commit a crime excusable by the defense of necessity, a defendant must prove "three essential elements: (1) the act charged must have been done to prevent a significant evil; (2) there must have been no adequate alternative; and (3) the harm must not have been disproportionate to the harm avoided." ***McMillan v. City of Jackson***, 701 So. 2d 1105, 1107 (Miss. 1997) (citing ***Cleveland v. Mun. of Anchorage***, 631 P.2d 1073 (Alaska 1981)).

¶23. The State contends that Anderson's most obvious adequate alternative here would have been to have his girlfriend remove the shotgun from the car. Anderson also could have avoided the harm caused by placing the weapon in a location where he would not have encountered another person, i.e., in the crawl space, where he later decided to hide the weapon.

¶24. Anderson's own admission of being a convicted felon in possession of a firearm negates that he was doing a lawful act. Moreover, he was not acting with ordinary caution by concealing the weapon behind him so his grandmother would not see it.

¶25. In ***Ealey v. State***, this Court found that Ealey was not acting with ordinary caution, entitling her to an accident-or-misfortune instruction when she gave "birth in a hotel room

9

rather than in a hospital, by wrapping the child in a comforter and putting the comforter in a garbage bag, by transporting the child in a suitcase in the trunk of her car, and by abandoning the child at church." *Ealey v. State*, 158 So. 3d 283, 291 (Miss. 2015).

¶26. Anderson repeatedly testified the reason he was allegedly attempting to dispose of the shotgun was because he knew he was not in lawful possession of it. The trial court was correct to refuse the requested instruction. The trial court found:

> he did admit that he was high on meth and he knew that he was not supposed [sic] to have the gun because of his previous felony conviction and he was also trying to conceal the gun from his grandmother, according to his testimony, so it appears that he knew he was not engaged in a lawful act.

¶27. Therefore, the excusable homicide by accident statute did not apply because it requires an accidental death occurring during otherwise lawful conduct with ordinary caution.

¶28. Under Mississippi Code Section 97-3-17(b), Anderson contends that evidence of the component of heat of passion was the ongoing loud argument about money and evidence of provocation was Davenport snatching the shotgun. The resulting discharge he claims, therefore, could have been found to be accidental because he never intended to shoot.

¶29. Anderson, however, testified that he did not shoot his grandmother because he was angry with her. In fact, he testified she never provoked him. Although his argument is contradictory, he contends he was entitled to an accident instruction involving heat of passion.

¶30. At trial, Height testified that after she heard Anderson arguing with his grandmother, he came outside, grabbed and loaded the shotgun, and reentered the house. Anderson's sister witnessed his girlfriend flee the scene and then heard the gunshot. Though no witnesses

10

heard the details of the argument, Anderson testified that Davenport denied him gas money, and he testified they might have argued about that. But he also testified that she did not provoke or enrage him.

¶31. In *Jackson v. State*, the defendant claimed that he acted in the heat of passion as a result of being denied his visitation request, so he requested an excusable homicide instruction. *Jackson v. State*, 815 So. 2d 1196, 1199–1200 (Miss. 2002). This Court affirmed the denial of that instruction, finding that the defendant's supposed reason for killing the victim was insufficient provocation to warrant the requested instruction. *Id.* at 1200. And in *Reed v. State*, this Court noted that an argument—unless it is "of such nature as to cause [a] defendant to believe he is threatened with grave, impending danger"—would never justify a homicide. *Reed*, 197 So. 2d 811, 814 (Miss. 1967). An instruction suggesting otherwise would be an incorrect statement of the law. *Id.*

¶32. Based on *Jackson* and *Reed*, the disagreement over gas money that Anderson and Davenport had was insufficient provocation to warrant an excusable homicide instruction based on heat of passion. The trial court was correct to deny the requested instruction.

    **II.**    **Whether the trial court erred by admitting evidence of Anderson's other bad acts.**

¶33. Anderson objected at trial that evidence he used methamphetamine just before the shooting and for several days before should have been excluded because it was more prejudicial than probative of guilt and was overall inflammatory.

¶34. Under Mississippi Rules of Evidence 401, "[e]vidence is relevant if, **(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and **(b)**

the fact is of consequence in determining the case." MRE 401. Under Rule 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, [or] confusing of the issues . . . ." *Johnson v. State*, 204 So. 3d 763, 769 (Miss. 2016) (internal quotation marks omitted) (quoting *Boggs v. State*, 188 So. 3d 515, 521 (Miss. 2016)). The trial court overruled Anderson's objection, finding that the evidence of his methamphetamine use was more probative than prejudicial.

¶35. Height and Anderson both testified that they had used methamphetamine the night before and for several days before Anderson killed his grandmother. Height first testified to that fact, and when she did, defense counsel objected, generally, that this was evidence of other crimes and should not be admitted. The State argued, however, that the evidence was presented to show Anderson's condition at the time of the killing—an important fact of the case. Generally, "[e]vidence of crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "[t]his evidence may be admissible for another purpose such as proving of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(1) and (2).

¶36. This Court has held that "proof of another crime or act" is allowed "when it is so interrelated to the charged crime that it constitutes either a single transaction or occurrence or a closely related series of transactions or occurrences." *Brown v. State*, 890 So. 2d 901, 912 (Miss. 2004) (citing *Duplantis v. State*, 644 So. 2d 1235, 1246 (Miss. 1994)). Also, proof of other acts is admissible when necessary to prove the defendant's state of mind or "to

tell a complete story to avoid confusion among jurors." *Id.* (internal quotation mark omitted) (quoting *Simmons v. State*, 805 So. 2d 452, 481 (Miss. 2001)).

¶37. Anderson later corroborated Height's testimony that they had been using methamphetamine in the days before he shot his grandmother, so he was not unduly prejudiced when the jury heard he had used methamphetamine. Anderson's drug use—and his own claim that he was high on methamphetamine at the time of the incident—was a fact relevant to his state of mind and motive at the time of the incident. Further, it "was necessary so as to complete a story for the jury as to the events leading up to the alleged [shooting]." *Price v. State*, 898 So. 2d 641, 653 (Miss. 2005).

¶38. Therefore, the trial court's decision to allow this testimony was not erroneous. The trial court did not abuse its discretion.

## CONCLUSION

¶39. Because Anderson's claims lack merit, we affirm.

¶40. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**