# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00807-COA

**JOHNNY MAX MOUNT, JR. A/K/A JOHNNY MAX MOUNT**  　　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**  　　　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/20/2023 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/07/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1.　Johnny Max Mount Jr. appeals his first-degree murder conviction, arguing that the trial court abused its discretion by finding him competent to stand trial and that the jury's verdict is contrary to the overwhelming weight of the evidence regarding his sanity at the time of the offense.　We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.　Around 1 a.m. on November 27, 2015, Mount entered a Waffle House on Beach Boulevard in Biloxi and sat down at the counter.　When Mount began vaping, one of the

waitresses, Julie Brightwell, told him that he could not vape inside the restaurant. Mount then stood up, drew a gun from his holster, reached over the counter, and shot Brightwell in the head, killing her. Mount turned to the other customers in the restaurant and asked if anyone else had anything to say. Mount then holstered his gun, walked outside, and placed the gun and holster on the hood of a truck in the parking lot. Less than two minutes later, Mount reentered the restaurant and went to the restroom. Once Mount was inside the restroom, the other customers quickly exited the restaurant. A few minutes later, Officer Eli Humphrey of the Biloxi Police Department arrived at the Waffle House in response to a 911 call. Humphrey found Mount waiting outside with his hands against the wall of the restaurant. Humphrey handcuffed and arrested Mount without incident. Mount was later indicted for first-degree murder.

### *Initial Evaluation by Dr. Macvaugh and Dr. Gordon*

¶3. In 2017, two psychologists retained by the defense, Dr. Gilbert Macvaugh and Dr. Heath Gordon, evaluated Mount and completed a forensic mental health evaluation report that included an extensive discussion of Mount's mental health history. Mount's mental health issues appear to stem primarily from injuries he suffered in 2002, when he was thirty-two years old.[1] In December 2002, Mount was struck by a car while walking across a highway. He suffered a skull fracture and multiple brain bleeds and was comatose after the accident. He also sustained various other physical injuries, and his left leg was amputated

---

[1] Prior to his injuries, Mount had served in the United States Marine Corps for six years, including multiple deployments overseas, and was honorably discharged; worked as a firefighter with the Biloxi Fire Department, among other jobs; and attended Mississippi Gulf Coast Community College for several semesters without obtaining a degree.

above the knee. He was hospitalized for two months and then referred to a rehab center for "cognitive, motor, functional, and sensory deficits secondary to traumatic brain injury" (TBI). He was discharged from the rehab center after six weeks with follow-up appointments for physical therapy, speech therapy, occupational therapy, and neuropsychology. He was diagnosed with, inter alia, TBI and related cognitive, motor, functional, and sensory deficits. At discharge, he was in need of 24-hour supervision and went to live with his mother and stepfather.

¶4. A neuropsychological evaluation report six months after Mount's injury stated: "Mount has shown significant improvement in several cognitive and motor domains. . . . He shows very subtle impairment on tasks of speed, cognitive processing, visual perception, and executive functioning. However, these represent significant improvement relative to his evaluation three months ago. It is expected that [he] will continue to improve from a cognitive and physical standpoint as he is still early post injury." At his twelve-month neuropsychological evaluation, doctors cleared Mount to drive "from a cognitive perspective" and suggested "a slow return to [an] academic environment." Mount reported "some difficulty with concentration[ and] inattention." IQ tests showed that Mount had average intelligence, similar to his pre-injury intelligence.

¶5. Mount was enrolled at Mississippi Gulf Coast Community College from 2003 to 2006; his semester GPA ranged from 2.0 to 4.0, and he obtained an associate's degree with a major in pre-pharmacy. He attended William Carey College (Gulfport campus) for three semesters in 2006 and 2007 pursuing a degree in nursing; he maintained a 4.0 GPA all three semesters.

3

He then transferred to the University of Southern Mississippi (USM) (Gulf Park campus) and was enrolled there from 2008 to 2010; his semester GPA ranged from 1.6 to 4.0 while at USM, and he obtained a bachelor's degree in history. In 2010, Mount took the Graduate Record Examination (GRE) and obtained a verbal score of 450 (49th percentile), quantitative score of 400 (12th percentile), and analytic score of 3.5 (26th percentile). Between 2010 and 2015, Mount submitted multiple applications for graduate school at USM but was never admitted. Mount was last denied admission on November 16, 2015.

¶6.     At age fourteen or fifteen, Mount had received inpatient psychiatric treatment after he had attempted to commit suicide by overdosing on Tylenol. Mount described the attempt as an attention-seeking gesture, and his mother explained that he had been unhappy after the family moved from Florida to Mississippi. After the hospitalization, Mount received outpatient treatment and was prescribed Zoloft for about two years. Mount began drinking alcohol as a teenager, was in an outpatient alcohol treatment program in 1995, and was in a residential treatment program for three months in 2004. Mount denied any problematic use of alcohol thereafter and denied using any illegal drugs or misusing any prescription drugs.

¶7.     Mount's mother reported that his personality and mental state had declined in the years following his brain injury and leading up to his arrest. She stated that in 2013, Mount told her that the "Sermon on the Mount" was about him. Around 2012, Mount began writing nonsensical letters about scripture and religion to FBI Special Agent in Charge Daniel McMullen[2] and FBI Director Robert Mueller. In these letters, Mount claimed that he could

---

[2] McMullen was the FBI Special Agent in Charge of the FBI's Jackson office.

communicate with God. After his arrest, Mount kept journals of similar nonsensical writings in which he referred to himself as the "Temple Mount" of the "New Jerusalem" and claimed to be "the rightful heir to the throne of Jesus Christ."

¶8.　　Mount had been arrested only twice prior to his arrest in this case, once for driving under the influence (in 2001) and once for reckless driving (in 2013 or 2014). Mount was married briefly in the 1990s and has one child. In 2008, Mount's ex-wife obtained a permanent restraining order against him after he forced his way into her home and assaulted her husband. Mount's ex-wife alleged that Mount had sent a series of threatening letters to her and her family and had initiated other threatening confrontations. Mount was ordered to have no further contact with his ex-wife or daughter. Mount's mother reported that he had been very involved in his daughter's life prior to his accident in 2002.

¶9.　　Macvaugh and Gordon's report noted that Mount gave a brief recorded statement to police after his arrest in this case. When Mount was asked what led up to the shooting, he said he had "a lot of anger . . . built up." When police asked him to "walk through the shooting" and explain what happened, Mount claimed that Brightwell "began to yell" at him after he began vaping. Mount told police that he "didn't deserve to be yelled at," "one thing led to another," and he "got too angry." Mount then exercised his right to remain silent.

¶10.　　A psychologist who saw Mount at the Harrison County Detention Center diagnosed him with TBI; psychosis, NOS (i.e., not otherwise specified); and personality disorder, NOS. The psychologist noted that Mount rambled about religious delusions and the Book of Revelation.

¶11. Mount later told his attorney that he drank some beer and took a Lortab (a prescription opioid/painkiller) before he went to the Waffle House. Mount said he was angry because people had been harassing him since 2003. He admitted that he had a gun in his hand at the Waffle House, but he would not answer his attorney directly about shooting Brightwell. Mount said "he was just a vessel from God" and that he had "died on the cross for" his attorney and others. Mount told his attorney that he could not tell him more about the day of the shooting because "the seal of revelation had not been broken."

¶12. Mount initially cooperated with Macvaugh and Gordon but later became less cooperative. Mount eventually ended their interview and asked to return to his cell. Macvaugh and Gordon believed that Mount was experiencing "paranoid, grandiose, and hyper-religious delusions." Mount told them he was "born a prince" and was also a "prophet." However, he did not claim to have the power to heal the sick, raise the dead, or predict the future. Mount initially denied experiencing any hallucinations but later described auditory hallucinations ("the voice of a child"). Macvaugh and Gordon found that Mount's short-term memory was "unimpaired," that his long-term memory was "fair," and that his judgment and basic problem-solving skills were "normal." When asked if he believed he suffered from a mental illness, Mount stated, "Yes, PTSD has a lot to do with it." Based on various tests and assessments, Macvaugh and Gordon found no evidence that Mount was malingering or exaggerating his symptoms.

¶13. Mount's score on the Mini-Mental State Examination, a brief screening test for cognitive impairment, fell within the normal range. Mount's score on the Wechsler Adult

6

Intelligence Scale indicated that he was of "average" intelligence. Macvaugh and Gordon administered the Evaluation of Competency to Stand Trial-Revised (ECST-R), a four-scale, interview-based competency assessment. The ECST-R measures the subject's factual and rational understanding of the courtroom proceedings, ability to consult with counsel, and overall rational ability. Mount's scores on three of the four scales "fell within the average (unimpaired) range, but his score on one competency scale ([rational understanding of courtroom proceedings]) fell within the range of 'Moderate' impairment."

¶14.    Mount understood that he had been charged with murder for killing Brightwell and that he faced a sentence of life in prison if convicted. He understood that the best possible outcome was a not-guilty verdict and that the worst possible outcome was a life sentence. He understood the purpose of a criminal trial and the roles of his attorney, the prosecutor, the judge, and the jury. Mount said he was not having any problems working with his attorney. Mount stated that he "would testify" at trial but then stated that he would consult with his attorney about whether to testify because the attorney had been "hired for that purpose." When Macvaugh and Gordon asked Mount questions about the plea-bargaining process, Mount stated that he did "not have academics toward religious matters"; he then became "irritated" and "abruptly declined to answer any further questions."

¶15.    Macvaugh and Gordon concluded that Mount "clearly appeared to be experiencing symptoms of psychosis consisting of paranoid and grandiose delusions containing primarily religious themes." They noted that Mount was "preoccupied with thoughts about 'scripture'" and "also claimed to be both a 'prophet' and a 'prince.'" They concluded that Mount's

7

"psychotic symptoms likely resulted from his traumatic brain injury." They found no evidence that Mount was malingering. They provisionally diagnosed Mount as follows:

1. Psychotic Disorder Due to Another Medical Condition (traumatic brain injury) with Delusions (and possibly also auditory hallucinations)

2. Diffuse Traumatic Brain Injury with Loss of Consciousness of Unspecified Duration, Sequela

3. Major Neurocognitive Disorder Due to Traumatic Brain Injury, With Behavioral Disturbance

4. Alcohol Use Disorder, Moderate to Severe by History, in Sustained Remission (within a controlled environment)

In addition, they found that "the following diagnostic considerations/rule outs also warrant[ed] further study":

1. Post-Traumatic Stress Disorder (PTSD)

2. Disruptive Mood Dysregulation Disorder

3. Unspecified Personality and Behavioral Disorder (Due to known physiological condition)

4. Other Substance Use Disorder (Opiate Use Disorder, by history)

¶16. Macvaugh and Gordon opined that Mount was not competent to stand trial. They concluded that although Mount had a sufficient factual understanding of the charges against him, he lacked an adequate *rational understanding* of his legal situation, as well as the capacity to consult with and assist his attorney in preparing his defense. Macvaugh and Gordon concluded that Mount's psychosis, grandiose delusions that he was a prophet or a prince, and preoccupation with scripture would prevent him from rationally understanding his legal situation and assisting his attorneys. They noted that Mount claimed the Book of

8

Revelation was "critically relevant to his criminal case," but he could not explain how. Macvaugh and Gordon were uncertain whether there was a substantial probability that Mount could be restored to competence within the foreseeable future. They stated that even with treatment and medication in a secure inpatient psychiatric facility, it was possible that Mount could not be restored to competence.

### Subsequent Evaluations

¶17. In March 2018, based on the Macvaugh/Gordon report and pursuant to Rule 12 of the Mississippi Rules of Criminal Procedure, the trial court ordered Mount to undergo a psychiatric evaluation at the Mississippi State Hospital at Whitfield for purposes of determining his competence to stand trial. In September 2019, psychologists Dr. Amanda Gugliano and Dr. Stephanie Howard submitted a report to the court. They stated that Mount had been prescribed Zoloft, an antidepressant, while at Whitfield and had remained on the medication. They stated that he had "consistently attend[ed] individual and group court competence restoration sessions, although his participation [was] variable." Gugliano and Howard concluded that Mount was not competent because he lacked "the present ability to perceive and understand the nature of the proceedings against him, to communicate rationally with his attorney about his case, or to testify in his own defense." They were unable to state, to a reasonable degree of psychological certainty, whether Mount could be restored to competence, but they noted that he had "made little progress toward competence restoration" since his admission to the State Hospital. Gugliano and Howard reported that Mount continued to express "grandiose religious beliefs, such as that he is a 'seer,' which he

9

described as being a type of prophet." He told them that his defense at trial would require proof going back to the date of his marriage (1994) and would involve scripture and other seemingly irrelevant subjects. They diagnosed Mount with "Major Neurocognitive Disorder Due to TBI, with behavioral disturbance; Psychotic Disorder Due to TBI, with delusions; and Personality Change Due to TBI, combined type." They concluded that Mount's TBI had significantly impaired his competence. They stated that with the court's permission, they would continue treating and evaluating Mount.

¶18. Gugliano and psychiatrist Dr. Thomas Recore filed a second forensic report in January 2020. They reported that Mount was taking Risperdal, an antipsychotic, in addition to Zoloft. They stated that Mount had "shown some clinical improvement in his symptoms." Gugliano and Recore felt that Mount "appeared somewhat guarded" in his more recent interviews and appeared to want to convince them that he was competent. However, Mount stated that if his case proceeded to trial, he would need Agent McMullen to testify in his behalf. Mount said that he had written McMullen letters about "scripture," but Mount could not logically explain how McMullen's testimony would help his case. Mount also stated that his "lineage," family, and religion would be important to his case. Gugliano and Recore concluded that Mount had a sufficient factual understanding of the legal process and his legal situation; however, they continued to find that he lacked the ability to communicate rationally with his attorney and assist in his defense. Gugliano and Recore were uncertain whether Mount could be restored to competence within the foreseeable future.

¶19. In May 2020, Gugliano, Recore, and psychologist Dr. Kathryn Olson filed a third

forensic report. They reported that Mount remained on the same medications and had "slowly shown clinical improvement in his symptoms." Specifically, they stated that Mount had shown progress in his ability to discuss his legal situation and "appear[ed] to at least be able to rationally weigh the evidence against him in his legal case," which he had been unable to do previously. Nonetheless, Mount continued to state that his defense would involve illogical or irrelevant subjects, including Agent McMullen, Director Mueller, Richard Petre,[3] and perceived "harassment" against him. The doctors concluded that Mount remained incompetent to stand trial, although they opined that he was "possibly restorable to adjudicative competence" with additional treatment.

¶20. In September 2020, Gugliano, Olson, and psychologist Dr. Amanda Berthold filed a fourth forensic report. They stated that Mount remained on the same medications and that since their last report, Mount had "appeared to put forth significant effort toward addressing [their] specific concerns regarding his competence-related abilities." For example, Mount pre-prepared and read a statement addressing the issues that the psychologists had considered indicative of delusional thinking. Mount also attempted to explain to the psychologists that certain beliefs or behaviors of his were relevant to his defense of not guilty by reason of insanity (NGRI), not his competence to stand trial. He told them that specific scriptures were "relevant to his legal defense, and he would need a religious expert, such as a rabbi or a priest, to testify in his defense and apply the scripture to his circumstances." Mount tried to

---

[3] This name is spelled "Petre," "Petri," and "Petry" at different places in the record. At trial, Mount testified that Petre was the director of the National Security Agency and a general in the United States Army Special Forces.

11

make a "positive impression" and to avoid matters that the psychologists considered "delusional"; however, he continued to discuss the Book of Revelation, Agent McMullen, and other seemingly irrelevant matters. Because some of Mount's delusional beliefs had remained "present" and "fixed" despite a long course of medication and treatment, the doctors concluded that Mount could not be restored to competence and should be returned to Harrison County to await further legal proceedings.

¶21. A competency hearing was set for May 2021.[4] Prior to the hearing, psychologist Dr. Ashley Batastini evaluated Mount again for the defense. Batastini remotely interviewed Mount twice for about three hours total via Zoom. Batastini reported that during the first interview, Mount did not demonstrate any paranoid or delusional beliefs, although he "often used odd phrasing" in his answers or declined to "expand on certain topics out of concern he would be depicted as incompetent." During his second interview, Mount again expressed a desire not to talk about his delusions. Ultimately, however, Mount "was unable to contain the urge to speak about [his delusions] in some detail." During the second interview, Mount again discussed the Book of Revelation and Petre's "harassment" of him. Mount claimed

---

[4] The hearing was prompted by motions Mount filed to commence civil commitment proceedings and dismiss the indictment or, in the alternative, pass the charge to the file. The United States Supreme Court has held that if there is no "substantial probability" that the defendant will be restored to competence in "the foreseeable future," "then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). Consistent with *Jackson*, our Rules of Criminal Procedure provide for the commencement of civil commitment proceedings if there is no "substantial probability that the defendant will become mentally competent to stand trial." MRCrP 12.5(e); *see also* Miss. Code Ann. § 41-21-63(2)(b) (Supp. 2024) (as amended effective July 1, 2024). There is no requirement that the indictment be dismissed.

that these subjects were relevant to his defense, but he "could not coherently explain how or why." Batastini concluded that Mount had an adequate factual and rational understanding of the charges against him, the legal proceedings and the roles of the various participants, and the plea-bargaining process. Further, Batastini believed that Mount "possessed sufficient behavioral controls to participate in court hearings." However, she concluded that Mount was not competent to stand trial because his mental state—including his preoccupation with religious topics, his religious delusions, and his delusions related to perceived harassment—would significantly interfere with his ability to assist in his defense and his ability to "convey[] his thoughts in a rational and logical manner during trial, should he decide to testify." Batastini opined that Mount's mental illness was attributable to his TBI. Batastini also opined that the odds of restoring Mount to competency were "low" given that he was still not competent after seventeen months of treatment at the State Hospital.

### *Competency Hearing and Ruling*

¶22. At Mount's May 2021 competency hearing, his six prior competency evaluation reports were admitted without objection at the outset of the hearing. Gugliano, Gordon, and Batastini testified at the hearing, and their testimony was consistent with their prior evaluation reports.

¶23. In response to questions by the trial judge, Gugliano testified that Mount wanted to go to trial and hoped to be acquitted or found NGRI. Gugliano testified that at first, Mount seemed to hope for an acquittal, "but as he got treatment and was advised of the weight of the evidence, he kind of moved toward NGRI." Gugliano was unsure whether Mount's

13

comments on that topic were "genuine because he would go back and forth." During one interview with Gugliano, Mount quoted scripture about individuals who were "blameless," and he thought that he might also be "blameless" due to his TBI. However, Gugliano said Mount's situation was not "similar" to the person the scripture described. Mount also told Gugliano that the "harassment" he experienced for years "led to feelings of anger that culminated [on the] day" of the murder.

¶24.    Batastini testified that Mount was reluctant to discuss delusions he had shared with prior evaluators because he feared that doing so would make him "look further incompetent." Mount told Batastini that "he very much wanted to be found 'courtroom competent,'" and he "wished he [could] recant something that he had said to [a] psychologist at Whitfield." He also told Batastini that his "only defense" at trial would be that he "had conversations with God." Mount told Batastini about Petre and others and a long history of "government harassment" that he felt was relevant to his criminal case. Batastini believed that Mount had a very good understanding of the legal process and the facts of his case; however, she opined that it was unlikely that he would be able to communicate rationally with his attorney, assist in his defense, or communicate rationally with a jury if he chose to testify. In response to questions by the circuit judge, Batastini stated, "I do believe he has the insight to make the decision not to testify . . . based on [his] feeling of not being able to communicate logically, but I don't think that he would be able to help prepare for his defense." Specifically, she stated that Mount thought that his religious beliefs and the government harassment were "somehow loosely connected to what his defense would be or could be, but he's not able to

14

clearly explain the connections." Batastini also felt that even if Mount pursued a defense of NGRI, he would be unable to logically "explain [his] state of mind leading up to," "during," and "after" the killing.

¶25. The State called only one witness at Mount's competency hearing, Erica Jimenez, a corrections deputy with the Harrison County Sheriff's Office. Jimenez had interacted and conversed regularly with Mount at the jail. Mount was "typically polite" and never said anything that struck Jimenez as abnormal or "delusional." Mount expressed normal complaints to Jimenez about other inmates and day-room time.

¶26. The trial judge questioned Mount briefly near the conclusion of the hearing. Mount confirmed that he understood the purpose of the competency hearing. After conferring with his lawyer, Mount declined to testify at the hearing.

¶27. After receiving briefs from the parties on the issue of Mount's competency, the circuit court found Mount competent to stand trial. After discussing Mount's mental health history and the six reports filed by the psychologists who evaluated him, the court summarized the issue before the court as follows:

> The doctors have testified that Mount now has a rational and factual understanding of the proceedings against him. With the treatment and medication at the State Hospital, he came to the point of understanding the evidence against him and the seriousness of the charge. It is also clear that he understands the proceedings and what to expect. The issue identified by the doctors is the ability to rationally consult with his attorney and rationally discuss his defense.

Addressing this issue, the circuit court found that

> Mount clearly recognizes that his defense is insanity and he has even discussed what he feels is necessary for an NGRI verdict. That defense perforce

15

involves putting on evidence of his beliefs and state of mind, what the doctors diagnose as delusions. The testimony at the hearing was specific as are the reports of the State Hospital that it is **only** when he begins to discuss this particular defense or mitigation that the doctors believe he is illogical and delusional.

The court ultimately found that Mount could "consult with his attorney with a reasonable degree of rational understanding" and that his delusions about "harassment and scriptures" did not render him incompetent. Rather, those delusions could "support [an] insanity defense" and, therefore, "ha[d] to be discussed and developed in order to present that defense." The court reasoned that "[i]t cannot be that [Mount] is incompetent to proceed only because he must discuss why he was not sane at the time of the offense of which he is accused." The court also observed that during Mount's competency hearing, he was well behaved and "appeared to be closely listening to the witnesses and paying attention." Further, Mount consulted with his attorney without incident and appeared to be able to make a reasoned decision not to testify during his competency hearing.

¶28. The court found that "Mount ha[d] a rational and factual understanding of the proceedings against him" as well as the ability to communicate rationally with his attorney and assist in his defense. The court emphasized that the fact that Mount's "**beliefs** [were] delusional or illogical" did not prevent Mount from rationally discussing those beliefs with his attorney. Rather, Mount clearly understood "that his defense center[ed] around his sanity at the time of the crime," and he was able to rationally communicate with his attorney and assist in the presentation of that evidence. Accordingly, the court found that Mount was competent to stand trial.

16

¶29.    Mount's case proceeded to trial in June 2023.  After jury selection, Mount's attorney renewed his motion to find Mount incompetent to stand trial.  Mount's attorney reported that Mount continued to be preoccupied with religious and paranoid delusions.  In addition, during the jury selection process, Mount had given the attorney three pages of notes that combined some of Mount's religious delusions with various complaints regarding the conditions of his confinement.  Mount's attorney reported that since he began representing Mount, he had received "at least one and a half, maybe two bankers boxes of [similar] correspondence from . . . Mount."  The trial court reviewed Mount's notes and reaffirmed its prior ruling that he was competent to stand trial.

¶30.    At trial, Dr. Recore testified as an expert in clinical and forensic psychiatry.[5]  Recore testified about Mount's 2002 accident, TBI, and recovery.  Recore opined that Mount did not meet the *M'Naghten* standard for legal insanity at the time of the offense.[6]

¶31.    Recore noted that following Mount's "extraordinary recovery" from his 2002 injuries,

---

[5] As discussed above, Recore co-authored two reports filed with the court in 2020 that concluded that Mount was not then competent to stand trial.  However, prior to trial, the court ruled that any testimony regarding Mount's competence to stand trial would not be admissible at trial.  The court reasoned that competence to stand trial must be determined by the court, not the jury, and is a distinct issue from sanity at the time of the offense.

[6] Mississippi follows the *M'Naghten* test for determining a defendant's sanity at the time of the offense.  *Ealey v. State*, 158 So. 3d 283, 293 (¶32) (Miss. 2015).  "The *M'Naghten* test for determining insanity is whether the accused knew right from wrong at the time the act was committed." *Id.*  To "prove insanity under *M'Naghten*, it must be proven that, at the time of the act, the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong." *Id.* at 293-94 (¶32) (quotation marks omitted).

his IQ was determined to be "average," which was consistent with his pre-injury records, and Mount went on to earn a bachelor's degree. This indicated that Mount's "intelligence and cognitive functioning was largely intact."

¶32. Recore testified that at the time of the subject offense, Mount was living by himself in an apartment in Biloxi. The offense occurred in the early morning hours the day after Thanksgiving. Mount had spent Thanksgiving at an aunt's house in Louisiana. He was there most of the day and "described it as a pleasant visit, but he was bothered by some things he had been dealing with for a long time." Mount returned to Biloxi around 5 p.m., drank about a quart and a half of beer, and took half of a Lortab pill for tooth pain. Mount later decided to walk to the Waffle House. Mount explained that he walked to the restaurant because he had "dr[u]nk enough that he was concerned that if he drove he might end up killing himself." Mount took a gun with him to the Waffle House. He explained that he took the gun "because of some perceived harassment that he had been dealing with and because he was walking on the beach at night." Mount was "angry" that night because he perceived that he was "being continually harassed" by the FBI and others. Mount also may have been angry about the recent rejection of his application to graduate school at USM and his lack of a relationship with his daughter, whom he had not seen in several years.

¶33. Mount stated that he "felt angry" when Brightwell told him that he could not vape in the Waffle House. Mount "stood up, pulled a pistol out, and then saw that [Brightwell] dove behind the counter." Mount "said he didn't aim at [Brightwell], but when he pulled the trigger, he had a feeling she had been hit." Mount told Recore that "when he pulled the gun

18

out he had the thought, ['I]f I do this, I can't go back,['] something along those lines."

¶34. Recore testified that Mount's statement to other customers after the shooting—asking if anyone else had anything to say—came "across as a more aggressive statement" and suggested that the shooting "was not borne out of some type of paranoia or feeling threatened." Mount told Recore that he went back inside the restaurant to use the restroom after the shooting because "urinating in public is illegal." And Mount told Recore that he waited outside the restaurant for the police to arrive because "he wasn't going to flee the scene of a crime." Recore opined that these statements showed that Mount had "knowledge of what's legal and illegal" and "knowledge of [the] wrongfulness" of his actions. Mount acknowledged that he knew at the time of the alleged offense that it would be illegal to shoot someone. Further, Mount acknowledged that the victim, Brightwell, was not involved in any of the perceived conspiracies against him and was not a threat to him. Based on his interview of Mount and a complete review of Mount's history, Recore testified "to a reasonable degree of medical certainty that at the time of the alleged offense Mr. Mount would have known the nature, quality, and wrongfulness of his actions" and "would have been able to distinguish between right and wrong." Recore explained that although Mount suffered from mental disease or defect related to his TBI, he did not meet the *M'Naghten* standard for legal insanity because at the time of the offense, he understood the nature and quality of his act and that it was wrong.

¶35. Mount testified in his own defense. At the outset of his testimony, Mount gave his name as "King and Lord Johnny Max Mount, Jr. as noted within Genesis as stated within the

numerical digits of 01049008." Mount stated that Richard Petre, who Mount said was the director of the National Security Agency and a general in the United States Army Special Forces, the FBI, and others had harassed him for years. Mount said that as a result of that long history of harassment, he was very "angry," his "mind was on fire," and he felt like he was being "burned alive" or "electrocuted" on the night he shot Brightwell. Regarding the crime, Mount testified, "I was so mad, so angry that – and I couldn't control the anger. . . . I was without any control of that anger." Mount also stated, "[T]hat was not my physical ability to be able to handle. It was not my decision." Mount said that he was unable to control his actions because of "things that had built up from 2007 until November 27th, 2015." He then stated,

> [I]n order to prove that fact to this court if I'm being charged for a serious charge such as murder, . . . I feel as if I should be able to use . . . what would be considered dilutions [sic] to medical health profession in order to prove my innocence. Not to hurt anyone necessarily per se, but to prove to the court that they are real, that they are an experience, and there is a separation there between that delusional and that of reality.

Mount stated that he had provided his attorney with "paperwork" about his delusions that he wanted to use in his defense. The court took a recess to allow Mount and his attorney to review Mount's writings to find what Mount felt was important. However, following the recess, Mount's attorney reported that Mount had sent him approximately 700 pages of correspondence, and Mount could not find the specific pages he wanted to use.

¶36. On cross-examination, Mount seemingly agreed that he was shown on video shooting Brightwell, but he disclaimed responsibility. When the prosecutor asked if he agreed that the "the video" showed him "shooting Julie Brightwell," Mount answered, "I would agree that

20

that was me on the video, yes." But Mount then denied that *he* shot Brightwell, telling the prosecutor, "I would think that you're placing the question in the wrong way." Mount acknowledged that the shooting "appear[ed] . . . evil," but he testified, "[I]t was actually a very respectful death. It was quick. Julie Brightwell felt no pain whatsoever. It was instantaneous. I know because I've been there. God is the one who killed Julie Brightwell." Mount stated that when Brightwell "dove behind the counter," he "put [his] hand forward." Mount further testified,

> When she dove down by that time it was too late. I can correlate it to and with a psychological aspect called the fight or flight syndrome. I had to fight for my life. I felt as if my life was in danger. I felt as if there was so much heat I was being electrocuted. Within the terms of a metaphor would be termed a human lightning rod from that of communications that could be viewed on Sistine Chapel in Leonardo da Vinci's where metaphorically maybe God is throwing lightning bolts down.
>
> . . . .
>
> I slapped the gun twice [to take off the safety].
>
> . . . .
>
> I was in flight mode, and all of a sudden the flight mode turned into a fight mode. It had to. I had to dissipate the anger within my mind.
>
> . . . .
>
> As soon . . . as she was diving my hand went forward.

Mount denied that *he* pulled the trigger, testifying that "God pulled that trigger." However, Mount stated that God was acting through him (Mount). Thus, Mount acknowledged that his own "finger . . . pulled the trigger that killed Julie Brightwell." Mount then stated, "The seal of God on my forehead is the one that pulled the trigger." Mount acknowledged that he

said to the rest of the customers, "[H]as anybody got a problem with that, an exclamation."

Finally, Mount stated,

> [W]hat I did was correct. . . . That's the only way that I can explain it according to my collegiate academics. That's something that was implemented from God. I didn't have a choice. With the New Testament standards I'm the son of God since that written is Jesus Christ. And since around the year 33 A.D. yes, I am the Messiah.

¶37.    Mount called two other witnesses. Alex Brady testified that he had served with Mount in the Marine Corps in the 1990s. Brady said that at the time, Mount was "quiet," "easy to get along with," and never had any trouble with anyone. However, Brady had not spoken to Mount since at least 1998. Mount's mother testified that Mount was a "good person" prior to his injury in 2002, but after his injury, he gradually developed delusions and strange beliefs, "became irritable, and . . . just wasn't the same [person] as before."

¶38.    The court instructed the jury on the elements of first-degree murder and gave the following instructions regarding Mount's defense of NGRI:

> The Court instructs the Jury that there is a presumption that an accused is sane and, therefore, the burden is initially on the accused to introduce evidence which creates a reasonable doubt as to his sanity at the time of the act. However, once the defendant has created a reasonable doubt as to the defendant's sanity, it is the burden of the State to present sufficient evidence to prove the defendant's sanity beyond a reasonable doubt.

> If you find that the State has proved beyond a reasonable doubt all the essential elements of First-Degree Murder, then you must find the defendant guilty of First-Degree Murder unless the State has failed to prove beyond a reasonable doubt that the defendant was sane at the time of the commission of the offense you find to have been committed.

> In order to prove the defendant sane at the time of the commission of First-Degree Murder, the State must prove beyond a reasonable doubt that at the time of the commission of First-Degree Murder, the defendant had the mental

22

capacity to realize and appreciate the nature and quality of his acts and to distinguish between right and wrong with reference to the acts he committed.

If after considering all of the evidence in this case you find the State has failed to prove beyond a reasonable doubt that the defendant was sane at the time of the commission of First-Degree Murder, then your verdict must be not guilty by reason of insanity.

The jury deliberated and returned a verdict finding Mount guilty of first-degree murder. The court sentenced Mount to life imprisonment, as required by law. Mount filed a motion for judgment notwithstanding the verdict or a new trial, which the court denied, and a notice of appeal. On appeal, Mount argues that the trial court abused its discretion by finding that he was competent to stand trial and that the jury's verdict is contrary to the overwhelming weight of the evidence regarding his sanity at the time of the offense.

**ANALYSIS**

**I.    Competence**

¶39.    There is a presumption that a criminal defendant is competent, and "[t]he burden of proof rests on the defendant to prove that he is mentally incompetent to stand trial." *Evans v. State*, 226 So. 3d 1, 14 (¶22) (Miss. 2017). A defendant is competent to stand trial if he has "the ability to perceive and understand the nature of the proceedings, to communicate rationally with [his] attorney about the case, to recall relevant facts, and to testify in [his] own defense, if appropriate." MRCrP 12.1. "[A] mental illness, defect, or disability alone is not grounds for finding a defendant incompetent to stand trial." *Id.* In addition, a competency determination "is a legal inquiry, not a medical inquiry." *McManus v. Neal*, 779 F.3d 634,

23

658 (7th Cir. 2015).[7] "This Court will reverse a trial court's competency determination only if it is manifestly against the overwhelming weight of the evidence." *Sandoval v. State*, 315 So. 3d 469, 474 (¶17) (Miss. 2021) (quotation marks omitted); *accord Garcia v. State*, 300 So. 3d 945, 965 (¶62) (Miss. 2020).

¶40.    In this case, the trial judge thoroughly considered whether Mount was competent to be tried, and we cannot say that her finding that he was competent was "manifestly against the overwhelming weight of the evidence." Mount had a factual and rational understanding of the charges against him and the legal proceedings. He understood that video evidence showed him shooting a defenseless woman in the head at close range and that he would likely be convicted. He understood that he was charged with first-degree murder and would be sentenced to life imprisonment if convicted. He could recall and discuss the crime and the events leading up to it and after. He also understood and could communicate rationally and logically regarding the plea-bargaining process. Mount asked logical questions of the trial judge during pretrial hearings, and he conferred with his attorney and decided not to testify

---

[7] Many other cases make this point. *E.g.*, *United States v. Brennan*, 928 F.3d 210, 215-16 (2d Cir. 2019); *United States v. Birdsell*, 775 F.2d 645, 651 (5th Cir. 1985); *United States v. Makris*, 535 F.2d 899, 908 (5th Cir. 1976); *Commonwealth v. Jones*, 90 N.E.3d 1238, 1249 (Mass. 2018); *State v. Bertrand*, 465 A.2d 912, 915 (N.H. 1983); *People v. Phillips*, 948 N.E.2d 428, 433 (N.Y. 2011); *State v. Green*, 973 N.W.2d 770, 775 (Wis. 2022); *Bodden v. State*, 314 So. 3d 458, 463 (Fla. 3d Dist. Ct. App. 2020); *State v. Hernandez*, 735 So. 2d 888, 893 (La. Ct. App. 1999). Our Rules of Criminal Procedure recognize the same point with regard to the issue of insanity at the time of the offense. *See* MRCrP 12.3 cmt. ("Whether a person is mentally ill, and to what extent, is a *medical* judgment that a psychologist and/or psychiatrist should make; whether the defendant is sufficiently ill to be exonerated of criminal responsibility, i.e., whether the defendant is legally insane, is a *legal* judgment for the jury or trier of fact to make after proper instructions." (emphasis added)).

during his competency hearing. Mount never indicated to the court or evaluators about any issues with his attorney.

¶41. Evaluators found that Mount's cognition, short- and long-term memory, abstract reasoning, and problem-solving skills were all "normal" or "unimpaired." IQ tests showed that his intelligence fell within the "average" range. The psychologists that the defense hired to evaluate Mount, Dr. Macvaugh and Dr. Gordon, administered the Evaluation of Competency to Stand Trial–Revised (ECST-R), an interview-based, four-scale assessment. Mount's score on one scale—rational understanding of courtroom proceedings—"fell within the range of 'Moderate' impairment." But his scores on the other three scales—factual understanding of courtroom proceedings, ability to consult with counsel, and overall rational ability—"fell within the average (unimpaired) range."

¶42. Mount acknowledged to evaluators that he had "mental health problems," which he attributed to "PTSD." Dr. Gugliano testified that Mount told her that his defense at trial would involve presenting evidence of his religious beliefs, perceived persecution and harassment, and his history of TBI. Gugliano testified that at "first," Mount hoped this evidence would result in him "being acquitted, but as he got treatment and was advised of the weight of the evidence, he kind of moved toward NGRI."

¶43. This is an unusual case in that video evidence clearly shows Mount deliberately shooting a defenseless woman in the head without the slightest provocation. Other than NGRI, Mount had no conceivable defense or even a factual basis for a lesser-included offense instruction. Therefore, what Mount needed to be able to do to assist in his defense

25

was to communicate rationally with his attorney *about his insanity defense*.[8]  The substance of Mount's insanity defense centered on his history of TBI, his paranoia and delusions of government harassment, and his grandiose religious delusions and claims that he was acting as an instrument of God when he killed Brightwell.  Mount understood this was his defense, and he assisted his attorney in pursuing it.  Mount also effectively communicated his delusions in detail to his attorney and to the jury.  In doing so, he succeeded in producing sufficient evidence to raise a plausible claim of insanity for determination by the jury.[9]

¶44.    The mental health professionals who evaluated Mount in this case all thought he was not competent to stand trial.  However, as stated above, competence to stand trial is a legal issue, not a medical one.  The trial judge found that the doctors who evaluated Mount had misunderstood or misapplied the *legal* standard for competency to stand trial, conflating the irrationality of Mount's beliefs and delusions with his ability to communicate rationally regarding those beliefs and delusions.  As the trial judge found, Mount understood that his beliefs, as well as his history of TBI, were the basis of his defense, and he was capable of communicating rationally with his attorney regarding his beliefs.  The trial judge's finding is not "manifestly against the overwhelming weight of the evidence."  *Sandoval*, 315 So. 3d at 474 (¶17).  Therefore, it must be affirmed.  *Id.*

   **II.    Sanity**

_____

[8] *See Parker v. State*, 273 So. 3d 695, 698 (¶11) (Miss. 2019) ("[W]ithout question, . . . competency and sanity are two distinct concepts.").

[9] *See Sanders v. State*, 63 So. 3d 497, 504 (¶21) (Miss. 2011) ("[T]he issue of insanity . . . is . . . a question to be resolved by the jury.").

26

¶45. Mount also argues that the jury's verdict is contrary to the overwhelming weight of the evidence regarding his sanity at the time of the offense. "Challenges to the weight of the evidence are granted only if the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Ealey*, 158 So. 3d at 293 (¶31) (quotation marks omitted). We must "view the evidence in the light most favorable to the verdict." *Id.* (quotation marks omitted). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). In addition, we "review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Id.* at 292 (¶21).

¶46. "The determination of a defendant's sanity under the *M'Naghten* Rule is within the province of the jury, and the jury has discretion to accept or reject expert and lay testimony on the subject." *Ealey*, 158 So. 3d at 294 (¶33). "A jury's finding on a defendant's sanity will not be reversed if it is supported by substantial evidence." *Id.* (quotation marks omitted). Indeed, the Mississippi Supreme Court has "held that, in insanity defense cases, perhaps more than any other, a jury's verdict ought to be given great respect and deference." *Id.* (quotation marks and brackets omitted).

¶47. Mississippi follows the *M'Naghten* test for determining sanity at the time of the offense. *Id.* at 293 (¶32). "The *M'Naghten* test for determining insanity is whether the accused knew right from wrong at the time the act was committed." *Id.* To "prove insanity under *M'Naghten*, it must be proven that, at the time of the act, the accused was laboring

27

under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong." *Id.* at 293-94 (¶32) (quotation marks omitted).

¶48. In the present case, Mount told evaluators and testified at trial that he was already angry when he went to the Waffle House and that Brightwell angered him when she said he could not vape in the restaurant. Mount told Recore that before he even pulled the trigger, he knew and thought to himself that if he shot Brightwell, he could not "go back." This awareness suggests that Mount understood the nature and wrongfulness of his actions. Mount acknowledged that he was simply angry at Brightwell, that she was not involved in any of the perceived conspiracies against him, and that she was not a threat to him. After Mount shot Brightwell, he turned to the other customers in the restaurant and asked if anyone else had anything to say to him. A jury could infer from these facts that Mount killed Brightwell out of anger and not because of any delusion that he was carrying out God's will.

¶49. In addition, Mount told Recore that after he killed Brightwell, he waited outside for police to arrive because "he wasn't going to flee the scene of a crime." A jury could infer from this behavior that Mount appreciated the nature and quality of his act and that it was wrong. Finally, after personally interviewing and evaluating Mount, Recore testified "to a reasonable degree of medical certainty that at the time of the alleged offense Mr. Mount would have known the nature, quality, and wrongfulness of his actions." The jury was entitled to weigh and accept Recore's expert opinion on this issue. *Id.* at (¶33). Moreover, no contrary opinion was offered at trial—Recore was the *only* expert to testify regarding

28

Mount's sanity at the time of the offense. In short, substantial evidence supports the jury's finding that Mount was sane at the time of the offense, and the verdict is not contrary to the overwhelming weight of the evidence. Accordingly, the trial court did not abuse its discretion by denying Mount's motion for a new trial.

¶50. Mount's primary argument on appeal is that the jury could not find that he was sane at the time of the offense because he never *admitted* that he committed the offense and insisted that "God pulled the trigger." Mount argues that a jury could not find that he appreciated the nature, quality, and wrongfulness of his act if he did not even appreciate that he committed the act. To begin with, we disagree with Mount's starting premise that a finding of sanity necessarily requires an "unequivocal admission" by the defendant that he committed the crime. If this were the law, any defendant with any mental disease or defect could avoid criminal responsibility simply by testifying that God committed the crime.

¶51. Moreover, although Mount testified that "God pulled the trigger" or "God . . . killed Julie Brightwell," he also admitted that his finger physically pulled the trigger. In addition, at other points in his testimony, Mount seemingly accepted the fact that he shot Brightwell. For example, Mount testified as follows:

> Q. And after you shot Julie Brightwell in the head, you walked outside, didn't you?
>
> A. Yes.
>
> . . . .
>
> Q. Why didn't you just [use the restroom] outside? You already shot somebody.

A.	Because it's illegal to use the restroom outside.

Q.	All right. It's illegal to shoot somebody in the face too, isn't it?

A.	Two wongs don't make a white, counselor. Two wrongs don't make a right.

Mount also told Recore that "when he pulled the trigger, he had a feeling [Brightwell] had been hit." Finally, Mount also testified that he was "angry" when he entered the Waffle House, that Brightwell made him "angry" when she told him not to vape, and that he had to "fight" "to dissipate the anger within [his] mind." The jury could have inferred from Mount's statements and testimony that he knew and appreciated that he had killed Brightwell and was only attempting to minimize his culpability or escape conviction by claiming that "God pulled the trigger."

¶52.	As stated above, when we review the denial of a motion for a new trial,

> [w]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

*Little*, 233 So. 3d at 289 (¶1). Moreover, we review the trial court's decision denying a new trial only for an abuse of discretion. *Id.* at 292 (¶21). Here, the jury's verdict was not contrary to the overwhelming weight of the evidence, and the trial court did not abuse its discretion by denying Mount's motion for a new trial.

## CONCLUSION

¶53.	The trial court did not abuse its discretion by finding Mount competent to stand trial

30

or by denying his motion for a new trial.

¶54.  **AFFIRMED.**

**CARLTON, P.J., LAWRENCE, EMFINGER AND WEDDLE, JJ., CONCUR. McDONALD, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., WESTBROOKS AND McCARTY, JJ.  ST. PÉ, J., NOT PARTICIPATING.**

**McDONALD, J., DISSENTING:**

¶55.  The facts of this case are very distressing because an innocent young woman was killed in cold blood.  Despite the emotions this evokes, our role is still to ensure that the system that brings those culpable of murder to justice operates according to the law.  In light of this, I dissent from the majority because, in my opinion, the overwhelming weight of the evidence presented at Mount's competency to stand trial hearing showed that Mount was unable to communicate rationally with his attorney or the jury if he chose to testify, two of the four elements of competency to stand trial.  The medical testimony presented at Mount's hearing established that over the years, with hospitalization, treatment, and medication, Mount had progressed from having none of these abilities to having two of the four.  But the majority concedes that all medical experts agreed Mount lacked the ability to rationally communicate with his attorney and confer about his defense.  Accordingly, I would reverse Mount's conviction and order that he be re-institutionalized for further periodic evaluations and a trial when the evidence establishes all four elements of competency.

**Facts**

¶56.  The record in this case contains numerous evaluations of Mount from 2017 through 2021.  Several of these doctors testified at Mount's competency hearing, which the majority

31

summarizes in four paragraphs. Because this hearing testimony is crucial to our review, I highlight it further.

*Competency Hearing*

¶57. At the hearing, Dr. Gugliano[10] reviewed her reports of April 2019, January 2020, and May 2020. She opined that in April 2019, Mount was not competent to stand trial because he did not have the ability to perceive and understand the nature of the proceedings, to communicate rationally with his attorney about the case, or to testify in his own defense if appropriate. She based this on Mount's fixation on government harassment[11] and her review of letters Mount wrote to his attorney about being able to subpoena God as a witness "because he wouldn't be able to appropriately defend his case without having religious scripture and God's testimony." In January 2020, Mount's thoughts were still disorganized, and in her opinion, he could not communicate with his attorney or testify in his defense. At that time, she had reviewed a 371-page typed manuscript and several letters that Mount had written, which contained quotes from the Bible with inserted song lyrics. Mount referred to himself as a prophet or the son of God.

¶58. Dr. Gugliano testified that during the next meeting in May 2020, Mount showed slow clinical improvement, but he still struggled to verbally express himself in a logical and coherent way. When they discussed his defense, Mount returned to needing to call "Kinsella,

---

[10] Dr. Gugliano was the director of the Forensic Evaluation Service at the State Hospital and had performed over 1,000 forensic evaluations to determine competency.

[11] Mount told her that he had spoken to Captain Kinsella at the New Orleans Fire Department, who had connections with Petri, who was subjecting Mount to "harassment and instigation."

32

Mueller, and McMullen" to testify about the harassment even though he could not explain the harassment or how it connected to the shooting. At that time, Dr. Gugliano concluded that Mount was still not competent to stand trial.

¶59. Dr. Gugliano then testified about her September 2020 report and the State Hospital staff's opinion that Mount's deficits, psychosis, and personality changes were due to his severe traumatic brain injury.[12] Dr. Gugliano said that during this fourth staff meeting, Mount read a letter to allegedly address the doctor's concerns about his competency, but the letter was not logical or helpful at all. Dr. Gugliano also opined that at all times, Mount was not malingering but, rather, trying to hide his symptoms. After reviewing a letter Mount wrote to his lawyer, Dr. Gugliano felt that Mount was not only incompetent but also "irrestorably incompetent."[13] She noted that even as Mount seemed to improve, it was more that he became aware of those thoughts that she might conclude were delusions. He would attempt to conceal those thoughts and, instead, say what he thought she wanted him to say. Although he tried to conceal them, Mount continued to have the delusions he had had for over ten years (delusions of harassment and beliefs about scripture that impacted him).

---

[12] This was based on some of the testing done at Methodist Rehabilitation Center about six to twelve months after his injury that showed some deficits in neurocognitive functioning. The medical records and Mount's mother's and ex-wife's information show that his personality changed after his TBI.

[13] She said that in the letter to his attorney Mount said he did not have the authority to speak of some things that had happened because the seal had not been broken on the Book of Revelations. Mount said that he wanted his dream log admitted into evidence because dreams are scripture, and "since you place your hand on the Bible when you give testimony, dreams should also be allowed as evidence since they are scripture."

Because medication was not helping, Dr. Gugliano attributed these delusions to his TBI[14] and maintained that he was unlikely to be restored to competence within the foreseeable future. In addition, she stated that "research suggests that psychosis due to a traumatic brain injury often has a delayed onset . . . as long as 20 years." Significantly, Dr. Gugliano said she met with Mount *the morning of the hearing*, and from her conversation with him, her opinion did not change.

¶60.    On cross-examination, Dr. Gugliano pointed out that the Risperdal Mount was taking for his psychosis and the Neurontin for anxiety only helped his clinical presentation (e.g., he was not irritable), but they did not allay his delusional beliefs. She concluded that Mount had improved in the clinical area but never in competence restoration. Such avoidance behavior is typical for those with delusional beliefs.

¶61.    Another witness, Dr. Batastini, testified about her April 2021 interview with Mount and her opinion that he was not competent to be tried. Batastini said her interactions with Mount were similar to those of Dr. Gugliano. Although Mount was knowledgeable about the criminal process and could communicate logically and rationally for a period of time, when she asked about his specific delusions (e.g., being a prophet), at first he did not want to talk about them for fear of appearing incompetent. But then, without further prompting, Mount started talking about them. Mount said, "[T]he only defense that I could have is that I had conversations with God." He then spoke about Petri hacking into his bank account and

---

[14] Dr. Gugliano pointed out that research backed up her opinion that psychoses due to TBI often had a delayed onset, and Mount may not have experienced symptoms of psychosis until years after his 2002 TBI injury.

retrieving his passwords. Dr. Batastini said in her opinion, Mount could not clearly communicate his decisions, actions, or behaviors that would assist in his defense, nor was he able to communicate to a jury in a manner that would make sense either.

¶62. On cross-examination, Dr. Batastini agreed that Mount wanted to be found "courtroom competent," as he phrased it. He even stated that he wished he could withdraw something he had said to a psychologist at Whitfield. Apart from discussing his case or his defense in particular, Mount could speak logically about legal proceedings, such as how he could be found guilty of perjury if he lied to the court. But when discussing the evidence in his case, Mount told her that "there was a lot more to it," and he would talk about being harassed and "instigated upon" by the "U.S. general forces" and Petri.

¶63. Upon the court's questioning, Batastini said she believed Mount had "the insight to make the decision not to testify based on having—based on a feeling of not being able to communicate logically, but I don't think he would be able to help prepare for his defense." Moreover, she did not believe he could logically explain how his religious beliefs and the harassment by the government played into events.

¶64. The State stipulated that two other doctors, Amanda Burton and Kathryn Olson, who also evaluated Mount at the State Hospital, would concur with the findings in their reports, namely that Mount lacked critical abilities and was not competent to be tried. The State called only one witness, Erica Jimenez, a jailer in "D Block," where Mount was housed when he was not hospitalized. She testified that Mount was polite, had normal conversations with her, and never came to her with any issues that were "delusional." On cross-examination,

35

however, Jimenez admitted that she never discussed Mount's charges with him or his version of events surrounding the shooting in his case. The court then asked if she ever discussed the Bible with Mount. She said she had not.

¶65. After hearing testimony, the court requested briefing on the issue of competency, noting that all the doctors suggested that Mount understood what was going on and was capable of testifying, but noting that he may not be capable of communicating in a way that everyone (including his lawyer) understood. The court stated:

> [R]eally what I see that the defendant is asking in this case is to say he's perfectly competent to live on his own and go out there and behave however he wants to but he's never going to be competent to be prosecuted because he has this defense that they deem to be delusional because they don't believe that he's being told these things or that he's being harassed or whatever, and that's what it boils down to.

¶66. In her written opinion on October 5, 2021, the circuit court ruled that Mount was competent to stand trial, noting Mount's progressive improvement over time. However, concerning the opinions of the doctors, the court concluded:

> Even though the doctors espoused that they understood that the issue of competence to stand trial is separate from the issue of competence at the time of the crime, they failed to actually recognize that difference in their various opinions.

The circuit court noted that according to the experts, the only issue was Mount's ability to rationally consult with his attorney and rationally discuss his defense. Even then, the court found that Mount could discuss his defenses with his attorney, except his insanity defense. The court stated:

> No one can say whether Mount is truly a seer or prophet. Many throughout time have claimed to be prophets or seers or sent from God. History teaches

us that many are misguided or delusional; many are charlatans; and some few really are what could be considered prophets. Most religions recognize that prophets have existed and/or do exist. Mount is further apparently using the scriptures as justification for either his beliefs or his behavior. This is neither new nor unique. Religious justifications have been used for man's actions since the mankind came to be. The issue is not whether Mount is or is not a seer or prophet or whether he is right about the scriptures or any religious justification for his beliefs or actions. The issue is that he apparently believes himself to be such a person and believes that the scriptures apply to him and his situation. That is not determinative of his competence. It may be evidence related to his sanity at the time of the crime but it does not make him incompetent to stand trial.

The court concluded:

Mount may be delusional about being a prophet or about being harassed by the government. Those are issues for a jury to determine in deciding if there is sufficient evidence to establish that those apparent beliefs or delusions either exonerate Mount or make him NGRI.

*Trial*

¶67. At trial, Mount's attorney gave Mount the jury questionnaires and asked him to take notes during voir dire. The attorney showed the court the rambling, three-page writing that Mount had produced. It began:

The sequence of numbers are 01049007-012, also noted as being within an eight digit sequence of place value holders minus the last three digits.

The name is King and Lord Johnny Max Mount Junior as noted within an eight digit sequence with a hyphen following three numbers. They are 0149007-012 also noted as being within an sequence of place value holders of eight numbers, a hyphen with three place value holders following those numbers. This is the Old Testaments benediction of Judah the Son of Jacob, the son of Isaac, the sone of Abraham. "Judah is a lions whelp from the prey my son thou have gone up as the benediction begins. . . ."

The document was entered into the record, and Mount's attorney explained to the Court that over the years, he had received similar correspondence from Mount that now filled two

37

banker's boxes. The document contained references to the "Old Testament benediction of Judah" and references to the death penalty. For example, one sentence read, "The death penalty is called for if found guilty of the death of Julie Brightwell not life imprisonment due to four methods of torture while incarcerated plus a fifth and possible sixth method of torture." Mount's attorney renewed his motion that Mount be found not competent to stand trial.

¶68. After reviewing Mount's writing during a break, the court went on the record and interpreted it paragraph by paragraph. The court stated, "And, again, he's talking about biblical things which he has done repeatedly in this case. But it also appears that he's raised some valid points." The court reviewed the verse in the Bible that Mount referenced concerning the benediction of Judah and said that if Mount thinks that passage deals with the death penalty, "that's certainly his opinion." The court stated Mount was talking about his incarceration, naming what block and section he was housed in. The court noted that Mount felt some of his rights had been violated, and although he refers to these as violations of standards for prisoners of war, it appeared to the court that Mount was complaining that he had been in jail too long. When Mount raised an instance of torture and how he had written to his attorney about it, the court explained it as Mount referencing his incarceration. The court acknowledged that it did not understand some sections, such as the benediction of Abraham that sired Isaac that sired Jacob and then an eight-digit sequence of numbers. Some, the court felt, was "a little nonsensical to follow." But it seemed to the court that Mount was just complaining about the death penalty, about being incarcerated and the space

38

that he has, and other prisoners talking to him about this being a high-profile case. The court concluded that Mount understood where he was, who his attorney (Davis) was, and who the jury was (and its function). The court did not change its prior ruling concerning Mount's competence.

**Discussion**

¶69. Mississippi Rule of Criminal Procedure 12.1 defines "competency" as a defendant's having: (1) the ability to perceive and understand the nature of the proceedings; (2) the ability to communicate rationally with his or her attorney; (3) the ability to recall relevant facts; and (4) the ability to testify in his or her own defense, if appropriate. *See also Dorsey v. State*, 310 So. 3d 1238, 1247 (¶30) (Miss. Ct. App. 2021).[15] The issue of competency to stand trial can arise before or at trial. Mississippi Rule of Criminal Procedure 12.2(a) provides that "[i]f at any time before or after indictment, the court, on its own motion or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court shall order the defendant to submit to a mental examination." Competency should be determined at the earliest stage of the proceedings, but even during trial, the court on its own, or a defendant's attorney, may order a mental evaluation. *Dorse*y, 310 So. 3d at 1248 (¶32).

---

[15] Rule 12.1(a) provides:

> **(a) Mental Competency.** There is a presumption of mental competency. In order to be deemed mentally competent, a defendant must have the ability to perceive and understand the nature of the proceedings, to communicate rationally with the defendant's attorney about the case, to recall relevant facts, and to testify in the defendant's own defense, if appropriate. . . .

MRCrP 12.1(a).

¶70. If raised during trial, the court must determine whether to proceed with the trial or order a mental evaluation. The court obviously must rely on what limited evidence such circumstances present. "The United States Supreme Court has explained 'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required.'" *Harris v. State*, 365 So. 3d 301, 304 (¶5) (Miss. Ct. App. 2021) (citing *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). In such instances, "whether a trial court has a 'reasonable ground' to suspect mental incompetency is within the discretion of the trial court," and "[t]his discretion is broad . . . because the trial judge is in the best position to observe the appellant and his demeanor." *Id*. at (¶6). Moreover, the standard of review for an appellate court is whether the trial court abused its discretion, namely "whether the trial judge received information which, objectively considered, should reasonably have raised a doubt about the defendant's competence and alerted the judge to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense. *Joiner v. State*, 240 So. 3d 1243, 1245 (¶7) (Miss. Ct. App. 2018).

¶71. When competency to stand trial is raised before trial, Rule 12.5 of the Mississippi Rules of Criminal Procedure sets out the procedure for the trial court's hearing, including the opportunity for the defendant to be represented by counsel and present evidence.[16] The four

---

[16] Rule 12.5 provides:

(a) Hearing. After submission of the reports, the court, upon its own motion or the motion of any party, shall promptly hold a hearing to determine the defendant's competency. The parties may introduce other evidence regarding the defendant's mental condition or, by stipulation (either written or stated on

40

elements of competency still apply, but on appeal, our standard of review is different. In such cases, we will reverse a circuit court's finding of competency to stand trial if it is manifestly against the overwhelming weight of the evidence. *Sandoval v. State*, 315 So. 3d 469, 474 (¶17) (Miss. 2021) (quoting *Dickerson v. State*, 175 So. 3d 8, 15 (¶16) (Miss. 2015)). Further, we evaluate the reasonableness of the evidence presented and the trial court's objectivity in its evaluation of that evidence:

> When this Court examines a trial court's determination of competency, our analysis is centered around three questions: (1) did the trial court objectively consider the information it received; (2) should that information reasonably have caused doubt about the defendant's competency; and (3) should that information have "alerted [the trial court] to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense?"

*Rickman v. State*, 129 So. 3d 960, 963 (¶10) (Miss. Ct. App. 2014); *Hutto v. State*, 227 So.

---

the record in open court), submit the matter on the experts' reports.

(b) Procedure. The competency hearing is a critical stage of the proceedings, at which the defendant shall be represented by counsel. The defendant shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses, and to confront and cross-examine witnesses who appear at the hearing.

(c) Finding of Competence. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and order the case to proceed to trial.

(d) Finding of Incompetence. If the court finds that the defendant is incompetent to stand trial, then the court may commit the defendant to the Mississippi State Hospital, other appropriate mental health facility, or other place of treatment, either inpatient or outpatient, based on the report of a psychiatrist or psychologist pursuant to Rule 12.3(c)(2)(C) and (E).

MRCrP 12.5.

3d 963, 976 (¶32) (Miss. 2017).

¶72. In this case, Mount had a pre-trial competency hearing, and at trial his attorney renewed his motion that Mount be found incompetent to be tried. For purposes of my dissent, I focus on Mount's pre-trial hearing where his counsel presented numerous medical reports and testimony concerning Mount's competency to stand trial. In my opinion, the testimony and reports of these competent and qualified doctors cast more than a reasonable doubt about Mount's competency, especially concerning his ability to rationally communicate and aid his attorney in his defense. The trial court's ruling to the contrary, in my opinion, is manifestly against the overwhelming weight of the evidence.

¶73. Over five years, ten medical doctors interviewed and evaluated Mount on the four factors relating to competency. The reports and testimony of the doctors established that initially, Mount could recall facts, but in a confused and rambling way. He was deficient in all other areas. Over the years, with treatment, Mount progressed to the point where he could understand the process and communicate on general topics more rationally.[17] However, all doctors concluded that up to the day of the competency hearing, Mount could not rationally communicate with his attorney or testify. The doctors also concluded that Mount was not malingering. Having two of the four abilities did not make Mount competent to stand trial;

_____

[17] The lengthy reports of these evaluators document both the improvements as well as the deficits in Mount's abilities at various times and should be considered in their entirety. For example, although Dr. Macvaugh and Dr. Gordon administered a standardized test to Mount on which he scored in the unimpaired range concerning his ability to consult with counsel, the overall evaluation of these doctors concerning that ability was "Mount lacks sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and his "psychotic symptoms appear to have significantly compromised . . . his capacity to consult with and assist his attorney in preparing a defense."

competency requires that Mount be able to do all four. Also, Mount has never been able to communicate rationally with his attorney, as shown by Mount's attorney representing to the court at the beginning of the trial that he had received enough incomprehensible letters from Mount over the years to fill two banker's boxes.

¶74. However, not liking the message of the experts at the competency hearing, the circuit court decided to shoot the messengers and explained away this overwhelming medical evidence of Mount's deficiencies by erroneously faulting the evaluating doctors. The circuit court stated:

> Even though the doctors espoused that they understood that the issue of competence to stand trial is separate from the issue of competence at the time of the crime, they failed to actually recognize that difference in their various opinions.

But in the very first report presented to the court, Dr. Macvaugh and Dr. Gordon specifically stated that the report addressed Mount's *competence to stand trial* and that the evaluators' purpose included the determination of, among other things:

- whether defendant was capable of understanding the charges against him;

- whether the defendant was capable of understanding the proceedings against him; and

- whether the defendant is capable of rendering his counsel assistance as needed in order to prepare a proper defense against the indictment.

These mirror the abilities listed in Rule 12.1. The report even contained a section entitled "Standard for Competence to Stand Trial" and cited United States Supreme Court and Mississippi case precedents on the elements of competency for trial purposes. Thereafter, each evaluation report presented to the court by medical doctors from the hospital where the

43

court had ordered Mount to be evaluated specifically described in some form or fashion the elements of competency reflected in Rule 12.1 and the doctors' opinions on Mount's abilities on each element.[18] Thus, the circuit court's finding that the medical doctors had misunderstood or misapplied the correct legal standard is not supported by the record and is clearly erroneous.

¶75. The majority ignores this clearly erroneous finding of the circuit court and justifies the court's wholesale exclusion of the experts' opinions by saying that "a competency determination is a legal inquiry, not a medical inquiry," citing *McManus v. Neal*, 779 F.3d 634, 658 (7th Cir. 2015). Relying on this statement, which the majority takes out of context and which has not been cited by any Mississippi court, the majority arrives at the erroneous conclusion that the trial court can disregard overwhelming, unrebutted medical evidence on the elements of competency when determining competency in a pre-trial proceeding.[19]

---

[18] The circuit court had ordered that Mount be hospitalized at Whitfield to be evaluated by doctors who presumably had the necessary expertise to evaluate defendants for trial competency. The court gave no reason for finding that these doctors no longer had the ability to differentiate between trial competency issues and the competency involved in an insanity defense.

[19] The statement that "a competency determination is a legal inquiry, not a medical inquiry," has not been used or cited by any Mississippi court and can be misleading. The *McManus* court, which considered whether a trial court should have ordered a competency evaluation when McManus's condition deteriorated during a trial, used this phrase because the trial court had failed to make any ruling on the defendant's competency. *McManus*, 779 F.3d at 658. The Seventh Circuit stated, "[B]ecause no competency examination was ordered (and thus no expert testified to the elements of the legal standard), we cannot infer that the judge's ruling was implicitly keyed to the appropriate legal test." *Id.* at 658.

The majority further states that "[m]any other cases make this point" (i.e., that competency to stand trial is a legal inquiry and not a medical inquiry) and cites the Fifth Circuit case of *United States v. Birdsell*, 775 F.2d 645, 651 (5th Cir. 1985). *Ante* at n.7. However, in *Birdsell*, in rebuttal to Birdsell's experts, the government presented testimony

¶76. Although competency hearings are legal proceedings and the court must decide the legal issue of an individual's competency to stand trial, the proof presented, for the most part, is medical proof related to the four essential elements of competency. Such medical evidence is commonly presented and relied upon by courts. For example, in *Sandoval*, 315 So. 3d at 470 (¶2), the defendant, charged with felonious child abuse, collapsed on the second day of his trial. After subsequently being examined by several doctors for his competency to continue to be tried, Sandoval was eventually examined by Dr. Christine Collins and Dr. Reb McMichael at the Mississippi State Hospital at Whitfield. *Id*. at 472 (¶10). At the subsequent competency hearing, both doctors testified to their specific findings and to their opinions. *Id*. at 472-73 (¶¶11-13). The trial court found Sandoval competent, and the case proceeded to trial. *Id*. at 473 (¶15). After being convicted, Sandoval challenged the court's

---

of one layperson and two experts that Birdsell was competent. *Id*. at 650. The Fifth Circuit commented that the trial court "obviously credited the testimony of the government witnesses over that of the defense." *Id*. at 650-51. Like several other cases, *Birdsell* boiled down to the trial court's weighing the evidence before it, including the testimony of experts for both sides, and making the ultimate legal decision on the defendant's competency to stand trial.

Another case cited by the majority, *Bodden v. State*, 314 So. 3d 458, 463 (Fla. 3d Dist. Ct. App. 2020), also stated that "the determination of competence is a legal question, not a medical one." However, like *Birdsell*, the *Bodden* court considered the testimony of three medical professionals who evaluated Bodden and testified. *Id*. at 460. Two opined that Bodden was not competent to stand trial, and one said that he was. *Id*. In discussing the role of the trial judge in such proceedings, the Florida district court pointed out that Florida Rule of Criminal Procedure 3.212 allows expert reports, which can be considered by the court. Ultimately, the court held that it is the trial court that must rule on the defendant's competency to stand trial and enter an order so finding. *Id*.

I agree that as in any court proceeding, the "determination of competence" is ultimately a legal question for the court to decide. But the court must do so from the evidence presented, which in this case included *overwhelming and undisputed* medical evidence of Mount's inability to rationally communicate with his attorney.

45

competency ruling on appeal. *Id*. at (¶16). The Mississippi Supreme Court pointed out that the State had presented the uncontradicted testimony of two doctors who had agreed to a reasonable degree of psychiatric certainty that Sandoval was competent to be tried. *Id*. at 474 (¶18). Sandoval had presented no testimony in rebuttal but argued that the testifying doctors had not considered his diagnosis of dissociative amnesia. *Id*. at (¶19). The Supreme Court noted that the doctors had reviewed Sandoval's medical history and never wavered from their opinions. *Id*. at (¶20). The Supreme Court held:

> Based on the evidence, including the unrefuted testimony of Collins and McMichael, the trial court determined that Sandoval was competent to stand trial. We find that the trial court's ruling was supported by the overwhelming weight of the evidence and was not "manifestly against the overwhelming weight of the evidence."

*Id*. at 475 (¶21). In Mount's case, the weight of the medical testimony of three testifying experts and a stipulation by the State that two other doctors would agree that Mount was *not* competent to be tried because he still lacked two crucial abilities was contradicted only by the testimony of a prison guard. As in *Sandoval*, the medical testimony here was unrefuted. In addition, Mount's case is not a case of competing expert opinions on competency, as in *Evans v. State*, 725 So. 2d 613, 663-64 (¶¶206-07) (Miss. 1997). Here, no medical professional testified that Mount had all four of the abilities needed to be found competent to stand trial. In my opinion, the circuit court's ruling was manifestly against the overwhelming weight of the evidence.

¶77. The opinions of the doctors who testified at the competency hearing were borne out at Mount's trial. When Mount's attorney asked him to take notes during voir dire, Mount

wrote three pages of illogical non-sequiturs that reference the death penalty, the separation of church and state, and sequences of numbers. Obviously, Mount's response to his attorney's request demonstrated that Mount could not communicate or assist his attorney during trial. The Mississippi Supreme Court has stated, "We emphasize that competency is the ability to rationally communicate with one's attorney about the case." *Robinson v. State*, 301 So. 3d 577, 582 (¶20) (Miss. 2020). When Mount's attorney renewed the motion that Mount be found incompetent to stand trial, the court, on its own, interpreted the convoluted writing that Mount had authored during voir dire. The court felt Mount made some coherent statements, including that a jury of twelve was present and references to his bond, which the court found showed Mount's understanding of the legal process. But concerning the bond issue, Mount had written:

> The second M.H.N. violation is very possibly noted by the U.N. and its council that should be noted as a violation of war standards for prisoners. Johnny's rank was never requested as bond monies for that implementation of a proper defense was not allowed after an over six year incarceration.

Mount's reference to a legal topic (his bond) did not make his thinking about it coherent or logical. An objective review of Mount's notes, in light of Mount's mental history pre- and post-event as well as his mental evaluations, confirms to me the picture painted by the experts of an individual who might appear normal ninety percent of time but who had delusions at critical times on critical subjects that made him unable to rationally communicate with his counsel and to a jury if needs be.

¶78. The majority further holds that Mount was competent because Mount understood his defense was insanity and that he assisted his attorney in presenting this defense by testifying

47

at trial with his often incoherent ramblings and delusional rationale for the shooting. To the majority, this was sufficient to show that Mount could effectively communicate with his attorney and assist in his defense. The majority completely ignores Mount's attorney's representations to the court that Mount was not and had never been able to communicate rationally with him. Moreover, the majority's logic—that anyone claiming a defense of insanity who testifies at trial is competent to stand trial—leads to the conclusion that mental evaluations and competency hearings are really not necessary at all. This flies in the face of the Constitution and established precedent that a competency ruling precedes or precludes a trial. *See Creppel v. State*, 305 So. 3d 1245, 1250 (¶17) (Miss. Ct. App. 2020) ("A person who is unable to understand the proceedings against him, to communicate with his attorney, or aid in his defense may not stand trial."); *Skinner v. State,* 385 So. 3d 406, 422 (¶63) (Miss. Ct. App. 2023) ("Consistent with an accused's constitutional due process rights, a defendant may only be tried if he is legally competent."); *Harris*, 365 So. 3d at 304 (¶4) ("Constitutional due process rights prohibit criminal prosecution if the defendant is not legally competent.").

¶79.    In conclusion, although this case involves the tragic death of an innocent person, when viewed objectively, the record contradicts the trial court's subjective opinion that Mount "only wanted to walk free, do what he wanted, and never be found competent to be tried." To the contrary, Mount's attorney requested that Mount be civilly committed, or if ever determined to be competent, that he be tried. In light of the evidence presented, I doubt that Mount will ever walk around free again. However, the integrity of the process must be

preserved, and my review of the record leads me to the conclusion that the circuit court's finding of competency to stand trial was against the overwhelming weight of the evidence presented at his competency hearing and should be reversed.

**BARNES, C.J., WESTBROOKS AND McCARTY, JJ., JOIN THIS OPINION.**